23001. BROOKS et al. v. HOOKS et al.

ARGUED JUNE 14, 1965—DECIDED JULY 14, 1965—
REHEARING DENIED JULY 29, 1965.

*Spivey & Carlton, Milton A. Carlton, John J. Spivey,* for plaintiff in error.

*Rountree & Rountree, W. E. Rountree,* contra.

GRICE, Justice. This is a controversy over financing the purchase and feeding of chickens for egg production.

It took the form of litigation when a petition was filed in the Superior Court of Emanuel County by Donald J. Hooks and others, trading as the Farmers Feed & Pelleting Company (hereinafter referred to as the plaintiff company), against Ralph M. Brooks, Master Feed and Grain Company, Inc. (hereinafter designated as the Grain Company), and McMillen Feeder Finance Corporation (hereinafter denominated as the Finance Company). The petition sought cancellation of two chattel mortgages and notes, injunction against their transfer or enforcement, damages, and general relief. Upon the overruling of general and special demurrers of the defendants, the trial court, by agreement of the parties, considered the verified petition and answers as evidence and temporarily enjoined the defendants from transferring the mortgages and notes and from attempting to enforce their collection. None of the special demurrers raised any issue as to duplicity.

Error is assigned upon the overruling of the demurrers and the grant of the injunction.

The petition, insofar as material here, made the allegations which follow.

The plaintiffs are engaged in selling feed and other such products.

The defendant Brooks is an agent of the defendants Grain Company and Finance Company. The Grain Company is an agent of the Finance Company.

In late 1962 or early 1963 Brooks requested that the plaintiff company act as dealer for the Grain Company and the Finance Company's chicken feed, in accordance with a plan, already in effect with others, substantially as follows.

Brooks would find farmers with facilities to feed and care for laying chickens and would outline to them a plan whereby a dealer would furnish financing for putting chickens in the houses and feeding them until they began production. The farmer would execute to the dealer a chattel mortgage on the chickens and a note. When production began the dealer would receive 80% of the egg proceeds until the chickens and the feed were paid for, and after such payment all of the proceeds would go to the farmer.

As between the dealer and the defendants, the plan was that, when Brooks found farmers who agreed to go into the transaction, he would obtain a financial statement from them and submit it to the Finance Company. If the latter approved the farmer's credit, Brooks would prepare an open-end chattel mortgage and note for a specified amount per chicken and have it executed by the farmer. The note and mortgage would then be transferred by the dealer to the Finance Company which would, upon receipt of them and an invoice showing that the chickens had been delivered to the farmer, send the dealer the proceeds for the note. These proceeds were actually payment for the chickens and some of the feed. Payments on the note would be scheduled so that the Finance Company would be repaid from the first eight months of egg production. The Grain Company would furnish to the dealer, on a 30 day account basis, the concentrate to be used in the feed sold to the farmer. If the farmer was still indebted to the dealer after the dealer paid the note to the Finance Company, it would transfer the note and mortgage back to the dealer. Under this program the dealer was never to own the chickens involved.

After studying this program and discussing it at length with Brooks, the plaintiffs decided to undertake it. A number of farmers agreed to participate, some of whom were accepted by the Finance Company and some were turned down. Notes and mortgages as previously outlined were prepared for those ac-

cepted; however, Brooks insisted that plaintiffs sign the notes and mortgages as well as the assignment and endorsement of them to the Finance Company. All of those contracts have now been paid out.

In early March 1963, Brooks advised Hooks, one of the plaintiffs, that the contracts of J. L. Cowart and E. L. Campbell had been approved and asked Hooks to sign their chattel mortgages and notes, although they had not been filled out. Hooks, having confidence in Brooks and expecting him to fill out and process these as before, signed the blank chattel mortgages and notes and turned them over to Brooks for him to complete as he had the previous ones. Soon afterward the chickens were delivered to Cowart and Campbell and the plaintiff company began furnishing feed as they had in other contracts.

In June 1963, Hooks told Brooks that the plaintiffs needed additional financing. A few days later Brooks reported to Hooks that the Finance Company had approved additional financing on the Cowart and Campbell contracts and again asked Hooks to sign blank mortgages and notes, stating that he would get them finished and turn them in to the Finance Company. Several days later plaintiffs received specified amounts on the Cowart and the Campbell chickens, and plaintiffs assumed that Brooks had processed these mortgages and notes as he had indicated and that Cowart and Campbell had signed as principals.

In late July 1963, plaintiff company received a notice from the Finance Company outlining payments due on the Cowart and Campbell contracts and noticed that the farmer listed was the plaintiff company and the dealer was the Grain Company. This was the plaintiffs' first indication of trouble with the Cowart and Campbell contracts. Hooks immediately contacted Brooks and called this situation to his attention. Brooks stated that there was nothing to worry about, that it was merely some sort of mixup in the Finance Company's office and he would see that it was straightened out.

In August the Cowart and Campbell chickens went into production and the plaintiffs began making the payments called for under the contracts.

In early 1964 the plaintiff company found for the first time

that the chattel mortgages and notes on the Cowart and Campbell contracts had been made out by Brooks from the plaintiff company to the Grain Company, and had been transferred by the latter to the Finance Company. Plaintiffs later learned that the invoices for the chickens had been altered by Brooks to show that the plaintiff company had purchased the chickens and that its name had been forged on the invoices showing their delivery. Brooks admitted these alterations and forgeries.

As soon as the plaintiff company learned of this situation, the Finance Company's credit manager, Hooks and Brooks went to the Cowart farm to discuss this situation with him. There, Cowart's father stated that after Hooks' and Brooks' original talk with Cowart, Brooks had returned alone; that on such later occasion Brooks told Cowart that "they" were now in position to offer another program whereby the farmer would receive 20% of the egg proceeds for caring for the chickens and collecting and processing the eggs; that the farmer would not be liable in any way for the chickens or the feed therefor; and that this was the understanding that Cowart had with Brooks as to his contract.

At the time of the foregoing conversation plaintiffs had a larger investment in the Cowart chickens than did the Finance Company since they had been furnishing the feed and had been turning over most of the egg proceeds to the Finance Company, believing that it held a note signed by Cowart as farmer. Thereafter, however, the plaintiff company credited all the egg proceeds to its own account for the Cowart chickens' feed.

The same situation was experienced as to the Campbell chickens.

The plaintiff company kept insisting to Brooks and the Finance Company's credit manager that some explanation be given for the way these two contracts were handled since it was contrary to their understanding. But no reasonable explanation was ever given.

The chickens under these two contracts continued to produce, but little more than the current feed bill. Finally, in August, it was agreed by Hooks, the Finance Company's credit manager, Brooks and another person of the defendant group that the Cow-

art and Campbell chickens be sold and the contracts paid out. They were sold, but it took all of the proceeds from the Campbell chickens and most of those from the Cowart chickens to pay the Campbell contract. The balance was applied to the Cowart feed indebtedness to the plaintiff company, leaving a balance of $8,483.39 due it on feed delivered to the Cowart chickens.

The defendants have defrauded and deceived the plaintiff company, have made misrepresentations of material facts wilfully to deceive it, have suppressed material facts which were known to the defendants and which they were under an obligation to communicate to the plaintiff company, have altered and forged instruments in connection with their dealings with it, all as hereinbefore fully set forth, and as a result of said actions, the plaintiff company has been damaged in the full amount of the actual loss sustained by it, $8,483.39.

The defendants have denied that they are indebted to the plaintiff company in any amount and the Finance Company is now calling upon the plaintiff company to pay the balance due on the notes represented by the Cowart contract, which amount they contend to be $15,210.25.

The mortgages and notes in connection with the Cowart contract, as finally filled out by Brooks, are in the defendants' possession and their production upon the hearing in this case is called for.

Such notes are null and void and unenforceable because of the facts surrounding their execution, as hereinbefore alleged.

The prayers of the petition included recovery of $8,483.39 as actual damages sustained; cancellation of the chattel mortgages and notes in connection with the Cowart contract; temporary and permanent injunction against transferring or attempting to enforce the notes or chattel mortgages; and general relief.

Besides general and special demurrers, each defendant filed an answer denying the material allegations of the petition. The recount of events in these answers was diametrically opposed to that of the petition. Each answer denied any fraud whatever and averred that the plaintiffs, not Campbell or Cowart, were primarily liable on the contracts and were liable for the unpaid balance. In the view which we take of the case it is not necessary to make further reference to the answers.

■ While the defendants urge several principles in support of their general demurrers, we need deal with only the one which follows. "Where a party who is entitled to rescind a contract on ground of fraud or false representations, and who has full knowledge of the material circumstances of the case, freely and advisedly does anything which amounts to a recognition of the transaction, or acts in a manner inconsistent with a repudiation of the contract, such conduct amounts to acquiescence, and, though originally impeachable, the contract becomes unimpeachable in equity. If a party to a contract seeks to avoid it on the ground of fraud or mistake, he must, upon discovery of the facts, at once announce his purpose and adhere to it. Otherwise he cannot avoid or rescind such contract." *Gibson v. Alford,* 161 Ga. 672 (5) (132 SE 442). See also *Manning v. Wills,* 193 Ga. 82 (3), 90 (17 SE2d 261).

The picture made by the petition is certainly not a pretty one. But, assuming that conduct amounting to fraud appears, repudiation of it is conspicuously absent. There is no allegation that after discovery of the conduct they charge to be fraudulent, the plaintiffs ever repudiated it. On the contrary, the allegations show acts of the plaintiffs which are inconsistent with repudiation.

First, in July 1963, the notice from the Finance Company outlining payments due on the Cowart and Campbell contracts listed the plaintiff company, instead of Cowart and Campbell, as the farmer and showed the Grain Company, rather than the plaintiff company, as the dealer. The plaintiffs were content with assurance from Brooks, upon whom they had no right to rely, that this was due to a "mixup" in the Finance Company office and that he would get it straightened out, and they started making the payments called for under the contracts. This state of affairs continued for at least six months.

Then, in early 1964, plaintiffs learned as a positive fact that the chattel mortgages and notes on the two contracts had been made out from the plaintiff company to the Grain Company, instead of from Cowart and Campbell to the plaintiff company, and that Brooks had altered the invoices to show that the plaintiff company, not Cowart and Campbell, had purchased the chickens and also had forged the plaintiff company's name

236

thereon to show delivery to it. Consequently, plaintiffs then knew that both of these contracts had been handled by Brooks in a manner different from the plan outlined to the plaintiffs. But, instead of repudiating the transactions and having no further part in them, plaintiffs merely "kept insisting that some explanation be given" for the way these two contracts were being handled. They were given no reasonable explanation but took no repudiatory action.

Finally, in August 1964, it was agreed by the plaintiff Hooks, the defendant Brooks, and the defendants' credit manager that the Cowart and Campbell chickens be sold and the proceeds applied toward paying out the Campbell contract, and this was done. This action by the plaintiffs was inconsistent with repudiation. It evidenced that the plaintiffs recognized their liability to the defendants under the chattel mortgages and notes which they now seek to have canceled on the ground of fraud.

The allegations of this petition call for application of the rule requiring repudiation as stated in the *Alford* case, 161 Ga. 672, supra.

(a) There being no repudiation of the conduct charged as fraudulent, the petition fails to allege a cause of action for cancellation, injunction or any other equitable relief.

(b) Under the facts alleged, discussed above, the petition does not set forth a cause of action for damages representing the unpaid feed balance on the Cowart contract. Whether or not the plaintiffs' failure to take any repudiatory action upon learning of the defendants' fraudulent conduct constituted a waiver of that fraud so as to bar their right to damages, certainly their subsequent active participation in the selling of the chickens was such a waiver. "If the defrauded party, with knowledge of the fraud, does an act in ratifying or affirming the contract which shows his intention to abide by the contract as made, with the fraud in it, and thus waives the fraud, he can not afterwards set up the fraud and recover damages therefor." *Tuttle v. Stovall*, 134 Ga. 325, 329 (67 SE 806, 20 AC 168).

■ Since the petition did not set forth a cause of action for any of the relief sought, it afforded no basis for the interlocutory injunction.

*Judgment reversed. All the Justices concur.*