A07A2357. INTERNAL MEDICINE ALLIANCE, LLC et al.
v. BUDELL.
(659 SE2d 668)

BERNES, Judge.

Following a bench trial in this action involving a business dispute, defendants Internal Medicine Alliance, LLC ("IMA"), Izabella Verbitsky, M.D., and Alex Goldstein appeal from the final order and judgment entered in favor of plaintiff J. William Budell, M.D. Appellants contend that the superior court erred by vacating a consent order incorporating a settlement agreement purportedly reached by the parties; by declining to take account of a lease obligation as an accrued liability in valuing Budell's ownership interest in IMA; and by holding that Verbitsky alone should be held legally responsible for the lease obligation. Appellants further contend that there was insufficient evidence to support Budell's claims for breach of fiduciary duty, conversion, punitive damages, and attorney fees under OCGA § 13-6-11. We reverse the superior court's judgment entered in favor of Budell's claims for conversion and

---

punitive damages and remand for a new trial on those counts. Additionally, we vacate the attorney fees award and remand for the fees to be limited to those incurred by Budell in prosecuting his successful claims. We affirm in all other respects.

"On appeal from the entry of judgment in a bench trial, the evidence must be viewed in the light most favorable to the trial court's findings of fact." *Realty Lenders v. Levine*, 286 Ga. App. 326, 326-327 (649 SE2d 333) (2007). So viewed, the record reflects that Verbitsky and Budell are physicians who practice internal medicine. In early 2005, they organized IMA as a limited liability company ("LLC") for the purpose of operating a medical practice together. The articles of organization filed with the Secretary of State of Georgia stated that IMA was to be a manager-managed LLC. Notably, Verbitsky and Budell never entered into a written operating agreement for IMA. They agreed, however, that they would each hold a 50 percent ownership interest in IMA, would share equally in the profits and losses, and would jointly manage IMA. While they were both practicing at IMA, neither Verbitsky nor Budell received any salary, compensation, draw, distribution, or any other money in return for participating in the practice.

Verbitsky and Budell made capital contributions to IMA in the amount of $70,000 and $70,199.21, respectively. The capital contributions were pooled together and used for startup expenses, including the purchase of computer hardware and software, phone equipment, furniture, and office space construction. As part of the startup of the practice, IMA entered into a seven-year lease for office space in the LaVista Office Park in DeKalb County. Under the lease agreement, Verbitsky and Budell both agreed to serve as guarantors of $70,000 in costs associated with the construction of the office space.

Problems developed before IMA opened for business when Verbitsky's husband, Goldstein, threatened Budell that the medical practice would break up if he was not made a member of IMA. Goldstein was not a physician, and Budell would not agree to Goldstein becoming a member. After IMA opened on July 5, 2005, the tensions between Verbitsky, Goldstein, and Budell continued to escalate to the point that Goldstein threatened Budell with physical violence.

Eight days after IMA opened, the parties met to discuss how to separate their medical practices. Initially, the parties agreed that Verbitsky would leave IMA and move her practice elsewhere, while Budell would stay at IMA and become the sole manager and member of the practice. A week later, Goldstein approached Budell and informed him, "No, we are staying. You are going." In order to avoid further hostility, Budell agreed to leave IMA and form his own practice by the end of 2005. It was understood by the parties that once

Budell left at the end of 2005, he would be entitled to redeem his 50 percent ownership interest in IMA and then would cease to be a member of IMA. Despite their agreement, tensions between the parties continued to escalate during the interim period before Budell left IMA. As a result, Budell filed the present lawsuit in September 2005 in the Superior Court of DeKalb County in which he sought, among other things, the value of his 50 percent ownership interest and attorney fees under OCGA § 13-6-11.

On October 3, 2005, the parties appeared at a hearing before the superior court to argue various motions. During the hearing, the parties asked for a recess so that they could discuss a possible settlement. After the parties concluded their discussion and the court reconvened the hearing, the parties took turns stating and attempting to clarify on the record the terms of the agreement they purportedly had reached. They specifically noted that "[e]verything in [the] case [would] remain[ ] active" until all financial issues were resolved, and that only upon resolution of those issues would the case be dismissed with prejudice. The superior court then pronounced that the alleged settlement agreement that had been placed on the record would serve as an order binding on all parties.

Both parties subsequently filed motions for contempt based on alleged noncompliance with the consent order. On November 21, 2006, the contempt motions came on for hearing before a different superior court judge to whom the case had been reassigned. After reviewing the October 3 transcript, the superior court ruled sua sponte that there had been no "meeting of the minds" and no enforceable consent order that could serve as a predicate for the contempt motions. Accordingly, the superior court vacated the purported consent order and ruled that the matter would proceed to a bench trial at a later date if the parties could not resolve their differences.

Budell spent his last work day at IMA on December 16, 2005. Following his departure, Verbitsky by her own admission was the sole member "running" the IMA practice. At the time he left IMA, Budell had generated over $40,000 in accounts receivable owed to IMA. But, under Verbitsky's management after Budell's departure, only a small portion of this amount was ultimately collected from insurance providers for the benefit of IMA. During this same period, Verbitsky reimbursed herself for her $70,000 capital contribution out of IMA's bank account, but chose not to reimburse Budell for his $70,199.21 capital contribution.

In the ensuing weeks, the parties were unable to resolve their remaining disputes, and Budell filed an amended complaint adding

claims for breach of fiduciary duty, conversion, and punitive damages.[1] A bench trial was subsequently held on Budell's claims in late January 2006.

At the bench trial, both parties agreed that Budell was entitled to redeem his 50 percent ownership interest in IMA, but they disagreed over the value of that interest measured as of December 31, 2005. Specifically, Budell presented expert testimony that based on 2005 business records, the value of IMA's net assets, on a cash basis, totaled $143,915 and the value of IMA's accounts receivable totaled $139,536. Based on these combined figures, Budell's valuation expert testified that IMA was worth $283,451 at the end of 2005, and that Budell's 50 percent ownership interest thus was worth $141,725.50. In contrast, while appellants' valuation expert substantially agreed with the numbers utilized by Budell's expert, he went on to testify that the future lease obligation of IMA had to be included in the valuation as an accrued liability. According to the appellants' expert, if the lease obligation was properly included, the value of IMA would be -$19,749, and Budell's interest would be worth -$9,874.

Also at the bench trial, Budell contended that Verbitsky breached her fiduciary duty to IMA and Budell by failing to have the accounts receivable for his patients properly processed and collected from insurance providers. He further contended that Verbitsky was liable for conversion for not reimbursing him for his capital contribution made to IMA. Finally, Budell asserted a claim for punitive damages predicated on his conversion claim and sought attorney fees under OCGA § 13-6-11.

After hearing all the evidence, the superior court entered a final order and judgment containing detailed findings of fact and conclusions of law. Declining to include the lease obligation in the valuation of IMA, the superior court credited Budell's expert valuation and found that his 50 percent ownership interest in IMA was worth $141,725.50. The superior court further concluded that Verbitsky was liable for breach of fiduciary duty and conversion, granted punitive damages based on the conversion claim, and awarded Budell his attorney fees and expenses.

1. Appellants contend that the superior court erred by vacating the October 3, 2005 order that incorporated a settlement agreement allegedly reached by the parties. Appellants' sole argument in this

---

[1] Budell brought a direct rather than derivative action on all of his claims. See generally OCGA § 14-11-801 et seq.; *Phoenix Airline Svcs. v. Metro Airlines*, 260 Ga. 584, 585-587 (1) (397 SE2d 699) (1990) (discussing difference between direct and derivative actions). None of the appellants challenged Budell on this point, and so it is not an issue on appeal.

regard is that the superior court to whom the case had been reassigned lacked subject matter jurisdiction to vacate the previously entered order when it heard the contempt motions. Their argument is without merit.

"Jurisdiction of the subject matter is the power to deal with the general abstract question, to hear the particular facts in any case relating to this question, and to determine whether or not they are sufficient to invoke the exercise of that power." (Citations and punctuation omitted.) *Williams v. Fuller*, 244 Ga. 846, 849 (3) (262 SE2d 135) (1979). Here, the superior court clearly had subject matter jurisdiction over this action involving a business dispute. See Ga. Const. 1983, Art. VI, Sec. IV, Par. I; OCGA § 15-6-8. Likewise, the superior court plainly had jurisdiction to hear the contempt motions after the case was reassigned to it. Cf. *Rockwood Intl. Systems Supply v. Rader Cos.*, 255 Ga. App. 881, 883 (1) (567 SE2d 104) (2002) ("[I]f proceedings are transferred from a court rendering judgment to another court, then the latter court acquires jurisdiction to hold a party in contempt of the judgment.").

Furthermore, trial courts, "while a cause is pending before them, have control over the record and proceedings, their orders and judgments, during the term; and after the term if the cause is still pending before them, and may amend or set them aside." *Bradley v. Tattnall Bank*, 170 Ga. App. 821, 823 (1) (318 SE2d 657) (1984). See also *Ritter v. State*, 272 Ga. 551, 553 (2) (532 SE2d 692) (2000). This rule applies, irrespective of whether the case has been reassigned to a different trial judge. See *Ritter*, 272 Ga. at 552-554 (2); *Bradley*, 170 Ga. App. at 824 (1). At the time that the superior court vacated the October 3 ruling, the instant case remained pending in that court; contrary to appellants' contention, the October 3 ruling was not a final order that disposed of the case. By its own terms, the ruling provided that "[the] case [would] remain[ ] active" and no dismissal would occur until all financial issues had been resolved by the parties, and it is undisputed that these issues were never in fact resolved or a dismissal order entered. As such, no final order had been entered in the matter and the case remained pending, so the superior court had authority to reconsider the October 3 ruling, vacate it, and order that the matter proceed to trial. See *Ford Motor Credit Co. v. Williams*, 194 Ga. App. 405, 406 (1) (390 SE2d 640) (1990). Compare *Levingston v. Crable*, 203 Ga. App. 16 (416 SE2d 131) (1992). It follows that appellants have alleged no basis for reversal.

2. Appellants next contend that the trial court erred in its award of damages by declining to take account of the future lease obligation as an accrued liability in valuing Budell's 50 percent ownership interest in IMA. Again, we disagree.

The issue of damages is a matter for the factfinder — here, the superior court — that generally should not be interfered with on appeal. See *Lou Robustelli Marketing Svcs. v. Robustelli*, 286 Ga. App. 816, 820-821 (4) (650 SE2d 326) (2007). As such, the superior court's award of damages will be upheld so long as it is within the range of testimony presented at trial. *Wachovia Bank of Ga. v. Namik*, 275 Ga. App. 229, 231 (1), n. 3 (620 SE2d 470) (2005).

At trial, Verbitsky testified as to her understanding of the agreement that had been reached with Budell concerning the valuation of his 50 percent ownership interest at the time he left IMA in December 2005. According to Verbitsky, the parties had agreed that the valuation of Budell's interest would include a portion of the "fixed assets, minus depreciation," plus what he "brought" to the practice, minus "overhead." Verbitsky further testified that she had never asked Budell to assume any obligation for the remaining payments on the lease. Given this combined testimony, interpreted in the light most favorable to the judgment, the superior court was entitled to find that the parties had agreed that the future lease payments would be excluded from "overhead" and would not be used in the valuation of Budell's ownership interest. We therefore affirm the superior court's damages award because it was within the range of the trial testimony.

3. Appellants assert that the superior court erred by ruling that Verbitsky alone should be held legally responsible for the lease obligation. We disagree because the superior court never made such a ruling. Rather, we construe the superior court as simply ruling that the valuation of Budell's ownership interest would not include the future lease obligation as an accrued liability — a ruling supported by the testimony at the bench trial, as discussed above in Division 2. Moreover, it is clear from the language of the lease that IMA, not its individual members, was liable for the lease obligation. See also OCGA § 14-11-303 (a). Verbitsky and Budell merely guaranteed the construction costs associated with the lease agreement. And, we do not read the superior court's order as purporting to release either Verbitsky or Budell from their obligations as guarantors. Accordingly, we find no ground for reversal.

4. Appellants further contend that there was insufficient evidence to support Budell's breach of fiduciary duty claim. The trial court found that Verbitsky breached her fiduciary duty to IMA and Budell by failing to have his accounts receivable properly processed and collected from insurance providers after he departed from IMA in December 2005. There was sufficient evidence to support this finding.

Managing members of a LLC owe fiduciary duties to the LLC and its member investors. See OCGA § 14-11-305 (1) ("A member or manager shall act in a manner he or she believes in good faith to be

in the best interests of the limited liability company and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."); *Argentum Intl. v. Woods*, 280 Ga. App. 440, 447-448 (3) (634 SE2d 195) (2006). See also *VGS, Inc. v. Castiel*, No. C. A. 17995, 2000 WL 1277372, at *4 (Del. Ch. Aug. 31, 2000), aff'd, 781 A2d 696 (Del. 2001); *Lerner v. Westreich*, No. 603184-2005, 2006 WL 1540310, at *3 (N.Y. Sup. Ct. June 5, 2006); *Tzolis v. Wolff*, No. 108353/05, 2006 WL 1310621, at * 7 (N.Y. Sup. Ct. March 20, 2006).[2] Thus, a managing member must act with the "utmost good faith and loyalty" in managing the LLC. *Quinn v. Cardiovascular Physicians*, 254 Ga. 216, 217 (2) (326 SE2d 460) (1985).

Appellants contend that Verbitsky did not exercise management over IMA and that to the extent that she did, it was agreed between Verbitsky and Budell that each physician would handle his or her own accounts receivable. The evidence, when construed in favor of the superior court's judgment, reflects otherwise. By her own admission at trial, Verbitsky was the sole member "running" the IMA practice after Budell departed in December 2005. At that point, Budell had turned in his keys to IMA and did not have access to that office space. Based on this evidence, the superior court was authorized to conclude that after Budell's departure, Verbitsky became the sole managing member of IMA, and Budell became a passive member investor. It follows that as the sole managing member of IMA, Verbitsky owed a fiduciary duty to IMA and Budell to administer and supervise the affairs of IMA in the manner "she believ[ed] in good faith to be in the best interests of the [medical practice]." OCGA § 14-11-305 (1). See also *Argentum Intl.*, 280 Ga. App. at 447 (3).[3]

Moreover, additional evidence in the record also supports a finding that Verbitsky breached her fiduciary duty. Budell testified that it was his standard practice at IMA to complete "super bill[s]" — standardized forms filled out by a physician after he or she sees a patient that contain codes for services performed — and to provide them to the billing clerk for processing and collection from insurance providers. The processing of super bills plays a critical role in a medical practice, since, according to the trial testimony, the general

---

[2] While "[t]he member's or manager's duties and liabilities may be expanded, restricted, or eliminated by provisions in the articles of organization or a written operating agreement" to a certain degree, see OCGA § 14-11-305 (4) (A), no such provisions exist in the present case.

[3] Appellants argue that Goldstein, not Verbitsky, was the manager of IMA. Both Verbitsky and Budell testified that Goldstein was not an IMA member. And, under Georgia law, a nonmember manager must be "designated, appointed, [or] elected . . . by the approval of *more than one half* by number of the members." (Emphasis supplied.) OCGA § 14-11-304 (b) (1), (2). There is no evidence that Goldstein was ever designated, appointed, or elected to be a manager of IMA with the approval of both Verbitsky and Budell. Hence, Goldstein lacked authority to manage IMA.

rule is that an insurance provider that is not billed within six months from the time of service will not pay the bill. When he departed in December 2005, Budell did not take his super bills with him, since they were accounts receivable owed to IMA. In fact, the outstanding super bills represented over $40,000 in accounts receivable that were to be paid to IMA. Budell testified that no one from IMA ever contacted him about any outstanding problems with his super bills.

After Budell's departure, the IMA billing clerk asked Verbitsky for guidance on what to do about Budell's outstanding super bills, but she did not get "any answers" from Verbitsky. Verbitsky never instructed the billing clerk to call, write, or otherwise contact Budell about the super bills, even though his new medical practice was located in the same office complex as IMA; the super bills were just "left . . . hanging." In contrast, during this same time period, Verbitsky hired an additional billing clerk specifically to assist with the processing of her own super bills, but not Budell's. As a result of this difference in treatment, only a small portion of Budell's $40,000 in accounts receivable was collected from insurance providers, while $98,151 of Verbitsky's accounts receivable was collected.

Based on this evidence, the superior court was entitled to find that Verbitsky failed to act in the best interests of IMA and Budell, and failed to exercise ordinary care, when she made the decision not to take any steps to have Budell's super bills processed and collected after his departure. Moreover, given the high level of hostility and the bad blood between the parties over the operation of IMA, the superior court was authorized to find that Verbitsky's decision was made in bad faith in an effort to negatively impact Budell's ownership interest in IMA. Therefore, the superior court was authorized to find that Verbitsky breached her fiduciary duty owed to IMA and Budell. See OCGA § 14-11-305 (1); *Argentum Intl.*, 280 Ga. App. at 447-448 (3).

5. Appellants likewise argue that there was insufficient evidence to support Budell's conversion claim, as well as the punitive damages that were awarded based on that claim. The superior court found that Verbitsky was liable for conversion based on her failure to repay to Budell the $70,199.21 capital contribution he made to IMA, and the court went on to award punitive damages based on the successful claim of conversion. We conclude that there was insufficient evidence to support the trial court's finding that Verbitsky was liable for conversion and its award of punitive damages.[4]

---

[4] Budell contends that appellants waived their allegation of error by failing to move for a directed verdict on the conversion and punitive damages claims. While the failure to move for a directed verdict bars appellants from arguing that they were entitled to judgment as a matter of law, they nevertheless may obtain a new trial if the evidence was insufficient. See *Aldworth Co. v. England*, 281 Ga. 197, 197-198 (637 SE2d 198) (2006).

"In order to establish a claim for conversion, the complaining party must show (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." (Citation and punctuation omitted.) *Metzger v. Americredit Financial Svcs.*, 273 Ga. App. 453, 454 (615 SE2d 120) (2005). Conversion is not available as a cause of action with regard to intangible property interests that have not been merged into a document. See *Southern Cellular Telecom v. Banks*, 208 Ga. App. 286, 290 (1) (431 SE2d 115) (1993). Compare *Decatur Auto Center v. Wachovia Bank*, 276 Ga. 817 (583 SE2d 6) (2003) (checks and other negotiable instruments can be converted). Hence, conversion is not a viable claim where there is nothing more than a failure by the defendant to pay money owed to the plaintiff. See *LaRoche Indus. v. AIG Risk Mgmt.*, 959 F2d 189, 191-192 (II) (A) (11th Cir. 1992) (applying Georgia law); *Decatur Auto Center*, 276 Ga. at 821, n. 8; *Faircloth v. A. L. Williams & Assoc.*, 206 Ga. App. 764, 768 (1) (426 SE2d 601) (1992) (holding that mere "contract debt . . . was not subject to an act in tort for conversion").

Here, Budell did not allege that his capital contribution was entrusted to Verbitsky for a specific designated purpose and was then misused by her. Compare *GLW Intl. Corp. v. Yao*, 243 Ga. App. 38, 42 (3) (b) (532 SE2d 151) (2000). See *LaRoche Indus.*, 959 F2d at 192 (II) (A) (concluding that there was no conversion as a matter of law when the case did not "involve a sum of money entrusted to someone for a particular purpose" that was then misapplied). Indeed, Budell testified that the capital contributions were combined together and properly used for startup expenses, including the purchase of computer hardware and software, phone equipment, furniture, and office space construction. Budell's claim instead was that he should be reimbursed for the amount he contributed in capital to IMA just as Verbitsky reimbursed herself for the amount she contributed in capital. Accordingly, Budell alleged and attempted to prove nothing more than a failure by Verbitsky to pay back money allegedly owed to him, which could not serve as the ground for a conversion claim. See *LaRoche Indus.*, 959 F2d at 191-192 (II) (A); *DeKalb Auto Center*, 276 Ga. at 821, n. 8; *Faircloth*, 206 Ga. App. at 768 (1). We therefore reverse the superior court's finding that there was sufficient evidence to support a conversion claim and remand for a new trial. And, because the punitive damages claim was predicated on the finding of conversion, we reverse and remand for a new trial on that claim as well. See *Walker County v. Tri-State Crematory*, 284 Ga. App. 34, 40 (1) (643 SE2d 324) (2007) (a party must succeed on the underlying tort claim to obtain punitive damages based on that claim).

6. Finally, appellants assert that there was insufficient evidence to support Budell's claim for attorney fees under OCGA § 13-6-11. We

conclude that there was sufficient evidence to support an attorney fees award, but that the award must be apportioned between successful and unsuccessful claims.

Under OCGA § 13-6-11, attorney fees and expenses may be awarded "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." Whether fees and expenses should be awarded is a matter for the factfinder and will be affirmed if there is any evidence to support the award. See *Paine v. Nations*, 283 Ga. App. 167, 171 (2) (d) (641 SE2d 180) (2006).

In the present case, the superior court predicated the award of attorney fees on its finding that Verbitsky was liable for breach of fiduciary duty and conversion. "A plaintiff is entitled to recover attorney fees only for that portion of the fees which are allocable to the attorney's efforts to prosecute a successful claim against a defendant." (Citation and punctuation omitted.) *Daniel v. Smith*, 266 Ga. App. 637, 640 (2) (597 SE2d 432) (2004). See *Monterrey Mexican Restaurant of Wise v. Leon*, 282 Ga. App. 439, 452-454 (6) (d) (638 SE2d 879) (2006). Therefore, the fees that are awarded "must be apportioned to those attorney fees attributable to claims on which the plaintiff prevailed." *Leon*, 282 Ga. App. at 453 (6) (d). Accordingly, because we held above in Division 3 that a new trial is warranted on the conversion claim due to insufficient evidence, we vacate the superior court's award of attorney fees and expenses. If the conversion claim ultimately fails on remand, then the superior court will need to conduct an evidentiary hearing and apportion the attorney fees award to the amount attributable only to claims upon which Budell prevailed. See id. at 454 (6) (d).

*Judgment affirmed in part, reversed in part, and vacated in part, and case remanded with direction. Blackburn, P. J., and Ruffin, J., concur.*

DECIDED MARCH 10, 2008.

R. Keegan Federal, Jr., John P. Marinan, for appellants.
Wilson, Morton & Downs, Robert E. Wilson, Debra A. Golymbiesk, for appellee.