[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11863
_____

D.C. Docket No. 4:10-cv-00045-CDL

DENIM NORTH AMERICA HOLDINGS, LLC,

Plaintiff - Appellee,

versus

SWIFT TEXTILES, LLC,
GALEY AND LORD, LLC,
PATRIARCH PARTNERS, LLC,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(August 9, 2013)

Before PRYOR, JORDAN, and KLEINFELD, [*] Circuit Judges.

PRYOR, Circuit Judge:

This appeal requires that we determine, first, whether a denim manufacturer waived its right to rescission of a joint venture based on fraudulent inducement when it demanded and accepted a capital contribution from its partner after it had already demanded rescission based on the alleged fraud, and, second, whether a non-manager member of a member-managed limited liability company owed fiduciary duties to its fellow member. Denim North America Holdings, LLC, entered a joint venture with Swift Textiles, LLC, and its parent companies for the manufacture and sale of denim. Holdings later discovered an alleged fraud committed by the Swift defendants and demanded rescission of the joint venture. But, a year after the discovery of the alleged fraud, Holdings made a capital contribution to the joint venture and demanded that the Swift defendants do the same. The Swift defendants satisfied that demand. Ten months later, Holdings filed a complaint against Swift, its parent company, and the owner of the parent company for breach of contract, fraudulent inducement, and breach of fiduciary duty. The Swift defendants removed that action from a state court to the district court. At trial, the jury returned a verdict in favor of Holdings on its claim of rescission based on fraudulent inducement, but did not reach its alternative claim

_____

[*]Honorable Andrew J. Kleinfeld, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

for breach of fiduciary duty.  Because Holdings waived its right to rescission and Swift, as a matter of law, owed no fiduciary duties to Holdings through its membership in the joint venture, we vacate the judgment in favor of Holdings and render a judgment as a matter of law in favor of the Swift defendants.

## I. BACKGROUND

Swift is the denim manufacturing division of Galey & Lord, LLC, a twill manufacturer.  Galey and all of its assets, including Swift, are owned by Patriarch Partners, LLC, a private equity firm based in New York.  Holdings operates a denim manufacturing plant in Columbus, Georgia.

Swift and Holdings entered a joint venture in 2006.  The joint venture was governed by three agreements: a subscription agreement, a manufacturing and supply agreement, and an operating agreement.  Swift and Holdings became joint members of the new Denim North America, LLC, and each owned a 50 percent interest in the joint venture.  Holdings agreed to manufacture and Swift agreed to sell the denim manufactured by their venture.  Under the terms of the joint venture, Swift would close its manufacturing plant and transition the production of its higher-priced denim to the Holdings plant.  Holdings agreed to sell its existing weaving machines, install the weaving machines used at the Swift plant, and hire and train additional employees.

3

During the negotiation of the joint venture, the Swift defendants provided Holdings sales projections for the first five quarters following the creation of the venture.  Holdings had requested that the Swift defendants guarantee the sales projections in writing, but the Swift defendants refused.  Although the sales projections were appended to the subscription agreement, it provided that the projections were "based on a number of assumptions that are beyond the control of [Swift]" and that "possible developments [] could cause actual results to differ materially from those forecasted in such sales projections."  The subscription agreement also provided that "[a]ny failure to attain the sales projections shall not constitute a breach of the foregoing representation or otherwise give rise to a cause of action by . . . Holdings."

The operating agreement provided that the joint venture would be managed by eight managers and that Holdings and Swift would each appoint four managers to the joint venture.  The operating agreement provided that, except when the consent of the members of the joint venture was required, "the [m]anagers ha[d] full and complete authority, power and discretion to manage and control the business, affairs and properties of the [joint venture], to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the [] business [of the joint venture]."

4

The operating agreement also provided that two-thirds of the members of the joint venture could vote to increase the total number of managers.

The operating agreement also established a method for demanding capital contributions to the joint venture. According to the operating agreement, if the funds of the joint venture were "insufficient to timely meet its current or imminent cash needs," either Holdings or Swift could demand that both "contribute the funds required" to fulfill the cash needs of the joint venture. Whichever member made the demand determined the amount and timing of the capital contribution. If either Holdings or Swift failed to meet the demand of the other for the capital contribution, the contributing party could elect to increase its interest in the joint venture at the expense of the non-contributing party.

The relationship between Holdings and the Swift defendants eventually began to deteriorate. Holdings was dissatisfied with the amount of denim that Swift was selling on behalf of the joint venture, and the principals of Holdings became convinced that the Swift defendants had defrauded them. During the negotiations for the joint venture, the Swift defendants had provided to Holdings a series of sales projections that Swift represented that it had calculated in good faith. But Holdings came to believe that the Swift defendants had provided it with sales projections that "were deliberately false" in order to "induce [Holdings] to agree to the [joint venture]." Holdings also believed that the Swift defendants

5

were selling denim in competition with the joint venture. Holdings knew when it entered the joint venture that Swift had an existing denim inventory and that Swift planned to sell that inventory. But Holdings did not know how much denim Swift had in its inventory, and Holdings came to believe that Swift had concealed millions of yards of denim that it intended to sell in competition with the joint venture. At trial, Holdings presented evidence that Swift had approximately $36 million worth of inventory, or ten-and-a-half million yards, when the agreements were executed.

Holdings became aware of the alleged fraud in 2007 and 2008, and Holdings demanded rescission of the joint venture in May 2008. Larry Galbraith, the chief executive officer of Holdings, testified that he became aware that Holdings had a claim against the Swift defendants in the second or third quarter of 2007. Tracy Sayers, a manager of the parent company of Holdings, testified that he became aware of the alleged fraud committed by the Swift defendants in the first quarter of 2008, but that Holdings first became suspicious of the actions of Swift "[s]ometime in late 2007." In its complaint, Holdings alleged that it made its "[d]emand for rescission of the partnership" at a board meeting of the joint venture on May 9, 2008. At the board meeting of the joint venture on September 3, 2008, Holdings outlined the fraud it alleged the Swift defendants had committed, including the inflated sales projections and the stockpiled inventory.

6

In 2009, about one year after Holdings demanded rescission of the agreements, Holdings made a capital contribution of $750,000 to the joint venture and demanded that Swift make a contribution in the same amount. Swift fulfilled that demand and contributed $750,000 to the joint venture. Galbraith testified that the capital contribution "was made by Swift because there's a provision in the operating agreement that requires Holdings or Swift to give capital to contribute cash if one or the other parties say it needs to be contributed."

Holdings filed a complaint against Swift, Galey, and Patriarch in a Georgia court. Holdings asserted claims for fraud in the inducement, breach of fiduciary duty, rescission, breach of contract, and breach of a duty owed by a member of a Georgia limited liability corporation, O.C.G.A. § 14-11-307. The claim of breach of fiduciary duty alleged that the Swift defendants made fraudulent misrepresentations and committed acts of fraudulent concealment, usurped partnership opportunities and engaged in conflict of interest transactions, and terminated its sales staff to the detriment of the joint venture. The claim of rescission alleged that Holdings was entitled to rescind the agreements because of "the fraudulent and illegal conduct engaged in by [the Swift] [d]efendants." Holdings requested compensatory and punitive damages, litigation expenses, and attorney's fees.

The Swift defendants removed the action to the district court and moved to dismiss the complaint. The district court dismissed the claim for breach of fiduciary duty against Patriarch and Galey, the claim for breach of contract, and the claim for breach of membership duties under Georgia Code section 14-11-307. The district court denied the motion to dismiss the claim for breach of fiduciary duty against Swift and the claim for rescission based on fraud in the inducement against all of the Swift defendants.

The Swift defendants then moved for a summary judgment, which the district court granted in part and denied in part. The district court described the claim for rescission based on fraudulent inducement as resting on two misrepresentations: that the Swift defendants fraudulently represented that they would produce a larger volume of "higher margin denim orders" than they were capable of producing and that the Swift defendants would provide financial records to Holdings that were never provided. The district court granted a partial summary judgment in favor of the Swift defendants insofar as the claim rested on the financial records, but denied a summary judgment against the claim that rested on the increased sales. The district court granted a summary judgment against the claim for breach of fiduciary duty insofar as the claim rested on the closure of two foreign manufacturing plants of Swift, but denied a summary judgment against the

8

remainder of that claim.  Holdings and the Swift defendants proceeded to trial on the remaining claims.

Holdings argued at trial that, when the Swift defendants were negotiating the joint venture, they were stockpiling denim to sell in direct competition with the joint venture.  Holdings argued that Swift also solicited new customers and sold denim to those customers in direct competition with the joint venture.  The Swift defendants argued that Holdings understood that Swift would independently sell its existing denim inventory and that Holdings complained about the joint venture only after a downturn in the national economy and the denim industry.  The Swift defendants also argued that Holdings waived its right to rescission when it demanded and accepted the capital contribution from Swift in 2009.

At the close of the evidence, the Swift defendants moved for a judgment as a matter of law.  See Fed. R. Civ. P. 50(a).  The Swift defendants described the claim for breach of fiduciary duty as resting on two separate breaches: that Swift sold denim in competition with the joint venture and that Swift terminated the sales staff of the joint venture.  And the Swift defendants argued that there was insufficient evidence for a reasonable jury to find that Swift was liable for either breach.  The Swift defendants also argued that Holdings waived its claim for rescission based on fraudulent inducement when it "repeatedly affirmed and acknowledged the contracts after discovering the alleged fraud."  The district court

9

dismissed the claim of breach of fiduciary duty insofar as it rested on the termination of the sales staff.  But the district court deferred judgment as to the claim for rescission based on fraudulent inducement and the claim for breach of fiduciary duty that rested on the sales of Swift inventory.

The district court instructed the jury about the claims for both rescission based on fraudulent inducement and for breach of fiduciary duty.  The district court instructed the jury that Holdings had alleged that the Swift defendants "misrepresented the volume and price of denim sales that would be achieved during the joint venture, that when they made the misrepresentations, they knew they were untrue, and that [Holdings] entered into the joint venture in reliance upon the misrepresentations which [Holdings] believed to be true at the time."  The district court instructed the jury about the affirmative defense of waiver raised by the Swift defendants and explained that, "if [the Swift] [d]efendants prove that [Holdings] took an action inconsistent with the repudiation of the agreements, you may find that [Holdings] has waived its right to rescind the contracts."  The district court instructed the jury that it should address the claim for breach of fiduciary duty against only Swift if it found against Holdings on the claim for rescission.

The jury returned a verdict in favor of Holdings on the claim for rescission and did not reach the liability of Swift on the claim for breach of fiduciary duty.  In a special verdict form, the jury found that the Swift defendants had "fraudulently

10

induced [Holdings] to enter the subscription agreement and operating agreement that created the joint venture that is the subject of this lawsuit." The jury found that Holdings had not waived its right to rescind the subscription and operating agreements. The jury found that the subscription and operating agreements should be rescinded and the joint venture terminated. The jury also found that the Swift defendants should pay the attorney's fees of Holdings but that Holdings should not be awarded punitive damages.

After the verdict, the Swift defendants renewed their motion for a judgment as a matter of law, but the district court denied the motion. The district court ruled that there was sufficient evidence to support the finding that the Swift defendants "had no intention of using commercially reasonable sales efforts to sell the denim." The district court ruled, without elaboration, that the jury had found "that Holdings had not waived its right to rescind the Agreements" and that this finding was "supported by the evidence and [is] not against the great weight of the evidence." The district court also ruled that, although the jury did not reach this question, there was sufficient evidence for a reasonable jury to find that Swift was a manager of the joint venture and breached a fiduciary duty to Holdings when it sold its denim inventory in competition with the joint venture. The district court then ordered the Swift defendants to transfer their ownership interest in the joint venture

to Holdings, and the district court ordered Holdings to pay the Swift defendants $2,242,500.

## II. STANDARD OF REVIEW

"We review the denial of a motion for a judgment as a matter of law de novo." Russell v. N. Broward Hosp., 346 F.3d 1335, 1343 (11th Cir. 2003) (quoting McCormick v. Aderholt, 293 F.3d 1254, 1258 (11th Cir. 2002)). We must uphold a jury verdict unless "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "In deciding a motion for judgment as a matter of law, we review all the evidence, drawing all reasonable inferences in favor of the nonmoving party." Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 724 (11th Cir. 2012). "The interpretation of a contract is a question of law that [we] [also] review[] de novo." Daewoo Motor Am., Inc. v. Gen. Motors Corp., 459 F.3d 1249, 1256 (11th Cir. 2006).

## III. DISCUSSION

We divide our discussion in two parts. First, we explain why the Swift defendants are entitled to a judgment as a matter of law against the claim for rescission because Holdings waived its right to that remedy. Second, we explain why Swift is entitled to a judgment as a matter of law against the claim for breach of fiduciary duty because Swift was not a manager of the joint venture. Because

12

we reverse the denial of the renewed motion for a judgment as a matter of law of the Swift defendants, we need not address the challenges of the Swift defendants to either the evidentiary rulings of the district court or its rulings on motions in limine.

### A. *Holdings Waived Its Right to Rescission.*

The Swift defendants argue that the district court should have granted a judgment as a matter of law in their favor on the claim for rescission for two reasons. First, the Swift defendants rely on the decision of the Supreme Court of Georgia in Novare Group, Inc. v. Sarif, 718 S.E.2d 304, 308 (Ga. 2011), to argue that Holdings cannot sue for the failure of Swift to fulfill a future promise and that Holdings agreed in the subscription agreement that it would not sue Swift for a failure to attain the sales projections. Second, the Swift defendants argue that Holdings waived its right to rescission when it affirmed its agreements with the Swift defendants after it became aware of the alleged fraud. Because we conclude that Holdings waived its right to rescission when it demanded and received a capital contribution from Swift after Holdings became aware of the alleged fraud, we need not reach the argument of the Swift defendants that the decision of the Supreme Court of Georgia in Sarif bars the claim for rescission based on fraudulent inducement.

13

A party who has knowledge of fraud that gives rise to a claim for rescission cannot, after he becomes aware of that fraud, act as if the contract is not rescinded:

> Where a party who is entitled to rescind a contract on ground of fraud or false representations, and who has full knowledge of the material circumstances of the case, freely and advisedly does anything which amounts to a recognition of the transaction, or acts in a manner inconsistent with a repudiation of the contract, such conduct amounts to acquiescence, and, though originally impeachable, the contract becomes unimpeachable in equity. If a party to a contract seeks to avoid it on the ground of fraud or mistake, he must, upon discovery of the facts, at once announce his purpose and adhere to it. Otherwise he cannot avoid or rescind such contract.

Brooks v. Hooks, 144 S.E.2d 96, 100 (Ga. 1965) (quoting Gibson v. Alford, 132 S.E. 442, 445 (Ga. 1926)).  Under Georgia law, whether a party has waived its right to rescind an agreement is ordinarily a question of fact for the jury to decide, Akins v. Couch, 518 S.E.2d 674, 675 (Ga. 1999), but where "the facts and circumstances essential to the waiver issue are clearly established[,] waiver becomes a question of law," Forsyth Cnty. v. Waterscape Servs., LLC, 694 S.E.2d 102, 110 (Ga. Ct. App. 2010) (quoting Mauldin v. Weinstock, 411 S.E.2d 370, 374 (Ga. 1991)).

We agree with the Swift defendants that, as a matter of law, Holdings waived its right to rescission.  Holdings acknowledges that Tracy Sayers testified that he learned of the fraud of the Swift defendants in early 2008.  And Larry Galbraith testified that he believed Holdings had been defrauded in May 2008.  Holdings alleged in its complaint that it demanded rescission from the Swift

14

defendants at the board meeting of the joint venture on May 9, 2008.  And

Holdings describes the board meeting on May 9, 2008, as the meeting in which it

"informed [the Swift] [d]efendants in no uncertain terms that it needed a 'divorce'

from Swift Galey . . . ."  Holdings acknowledges that it "specifically outlined the

various fraudulent acts that [the Swift] [d]efendants committed in the inducement

of the joint venture" during the board meeting on September 3, 2008.  But

Holdings also freely admits that it invoked a provision of the operating agreement

in 2009 when it demanded that both it and Swift make separate capital

contributions of $750,000 to the joint venture.  There is no dispute then that

Holdings discovered the alleged fraud, demanded rescission of the agreement in

2008, and then demanded and accepted a capital contribution from Swift in 2009

under the terms of that same agreement.  See Hill v. Fed. Trade Comm'n., 124

F.2d 104, 106 (5th Cir. 1941).

When Holdings relied on the agreement to demand and accept the capital

contribution in 2009, it waived its right to rescission.  "[A]n attempt to continue to

operate [a venture] and to do so in a profitable manner" when a party seeks to

rescind the sale of that venture is "totally incompatible with contract rescission"

and constitutes a waiver of the right to rescission.  Orion Capital Partners, L.P. v.

Westinghouse Elec. Corp., 478 S.E.2d 382, 385 (Ga. Ct. App. 1996); see also

Brooks, 144 S.E.2d at 100 (explaining that when a party entitled to rescind a

15

contract "freely and advisedly does anything which amounts to a recognition of the transaction, or acts in a manner inconsistent with a repudiation of the contract, such conduct amounts to acquiescence," and the party cannot rescind the contract on grounds of fraud).  Because invoking an agreement to obtain a contractual benefit is "incompatible with contract rescission," Holdings waived the right to sue the Swift defendants for rescission.  See Orion Capital, 478 S.E.2d at 385.

Holdings argues that we cannot disturb the finding by the jury that it did not waive its right to rescission, but "facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them."  Hill, 124 F.2d at 106.  Holdings concedes that it was aware of the fraud that gave rise to its claim for fraudulent inducement by 2008 and that it demanded and accepted the capital contributions from Swift in 2009.  The finding by the jury that Holdings did not waive its right to rescission is foreclosed by the legal effect of the unequivocal concessions of Holdings (in its complaint and brief) that it demanded the capital contribution after becoming aware of the alleged fraud by the Swift defendants.  These concessions, which are consistent with the undisputed evidence at trial, are "no longer [] fact[s] in issue."  Id.  Given these facts, Holdings waived its right to rescission as a matter of law.

Holdings also argues that, under the tender rule of Georgia law, its demand that Swift make the capital contribution was not an action inconsistent with its

16

earlier discovery of fraud and demand for rescission, but we disagree. Under ordinary circumstances, "[o]ne who seeks rescission of a contract for fraud must restore or offer to restore the consideration received thereunder, as a condition precedent to bringing the action." Crews v. Cisco Bros. Ford-Mercury, Inc., 411 S.E.2d 518, 519 (Ga. Ct. App. 1991). But "restoration by the purchaser is not an absolute rule," id., and a party need not "restore or tender back the benefits received under the contract" if he can "show a sufficient reason for not doing so," id. For example, the party claiming rescission "need not tender back what he is entitled to keep, and need not offer to restore where the defrauding party has made restoration impossible, or when to do so would be unreasonable." Id. But this rule, as the Swift defendants argue, has nothing to do with the application of the doctrine of waiver in this case.

Holdings relies on our decision in Vivid Investments, Inc. v. Best Western Inn-Forsyth, Ltd., 991 F.2d 690 (11th Cir. 1993), to support its argument, but that decision is inapposite. In Vivid, the purchaser in a real estate contract sought rescission of the contract, but did not tender the property back to the seller. Id. at 692. We held that a factual dispute existed about whether the purchaser was required to tender the property. Id. at 693. The purchaser had argued that it was not required to tender the property because the tender "would be an abandonment of its investment and because the [property] is the security for debt owed by [the

17

purchaser] to third parties." Id.  Holdings argues that the capital contribution of Swift was necessary because the joint venture was in dire financial straits and Holdings otherwise would have been forced to "abandon[ ] its investment," see id., but Holdings misreads Vivid and the tender rule, which concern only whether a purchaser must return property it has already received from the seller, not whether a party may demand new investments under the terms of a contract after it has demanded rescission.  Although the tender rule does not require a party to return all of the property it has received when doing so would be impossible, the tender rule did not permit Holdings to make a new investment in the joint venture and demand that Swift comply with future obligations under the operating agreement.

### B. Swift Was Not a Manager of the Joint Venture and Did Not Owe Holdings Any Fiduciary Duties.

Swift also argues that it was not a manager of the joint venture and, as a matter of law, did not owe Holdings any fiduciary duties.  "To support a claim of breach of fiduciary duty, a plaintiff must prove the existence of such duty. . . ." Wright v. Apartment Inv. & Mgmt. Co., 726 S.E.2d 779, 787 (Ga. Ct. App. 2012). The Georgia Limited Liability Company Act, O.C.G.A §§ 14-11-100–1109, establishes as follows that, where a limited liability company vests its management in a manager, a member of the limited liability company who is not a manager owes no duties to the company or other members:

> Except as otherwise provided in the articles of organization or a written operating agreement, a person who is a member of a limited liability company in which management is vested in one or more managers, and who is not a manager, shall have no duties to the limited liability company or to the other members solely by reason of acting in his or her capacity as a member.

Id. § 14-11-305(1).  Unless there is an operating agreement to the contrary, "management of the business and affairs of the limited liability company shall be vested in the members. . . ."  Id. § 14-11-304(a); see also id. § 14-11-304(b) ("If the articles of organization or a written operating agreement vests management of the limited liability company in one or more managers, then such persons shall have such right and authority to manage the business and affairs of the limited liability company.").  And, under Georgia law, courts read written operating agreements that form limited liability companies "to give maximum effect to the principle of freedom of contract and to the enforceability of operating agreements." Id. § 14-11-1107(b).  "Although the parties may impose such duties in the operating agreement or articles of organization," the plain language of the Georgia statute establishes "that non-managing members in manager-managed [limited liability companies] owe no duties to the [company] or other members." ULQ, LLC v. Meder, 666 S.E.2d 713, 721 (Ga. Ct. App. 2008).

Holdings argues that Swift owes it fiduciary duties because it was a manager of the joint venture, but the terms of the operating agreement of the joint venture provide that Swift is only a member, not a manager, of the joint venture.  See id.

19

The operating agreement explains as follows that the management power of the joint venture will be vested in the managers:

> Except for situations in which the approval of the Members is expressly required by the Articles of Organization or by this Operating Agreement or by nonwaivable provisions of applicable law, the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  At any time when there is more than one Manager, no one Manager may take any action permitted to be taken by the Managers, unless the action has been approved by a majority of the Managers.

Along with vesting the management power in the managers, the operating agreement states that there were to be eight managers of the joint venture and that Swift and Holdings were to appoint four managers each.  Based on the terms of the operating agreement, Swift is not a manager of the joint venture.  Although Swift had the authority to appoint four managers for the joint venture and at least theoretically could have appointed itself, see O.C.G.A. § 14-11-304(b)(2) (stating that managers of a limited liability company need not be "natural persons"), there is no allegation in the pleadings or evidence in this record that Swift appointed itself as a manager of the joint venture.

Although the district court ruled that the authority of Swift to appoint four managers gave it "de facto control" over the board of managers, Georgia law forecloses that reasoning.  Unless otherwise provided by an operating agreement, a

"manager" of a Georgia limited liability company "[s]hall be designated, appointed, elected, removed, or replaced by the approval of more than one half by number of the members." Id. § 14-11-304(b)(1).  In other words, Georgia law presumes that managers will be appointed by the members of a limited liability company.  Georgia law also states that "a person who is a member of a limited liability company in which management is vested in one or more managers, and who is not a manager, shall have no duties to the limited liability company or to the other members solely by reason of acting in his or her capacity as a member." Id. § 14-11-305(1) (emphasis added).  Because Georgia law presumes that members will appoint the managers of a limited liability company, the act of a member appointing a manager cannot give rise to a fiduciary duty.

Holdings cites Internal Medicine Alliance, LLC v. Budell, 659 S.E.2d 668 (Ga. Ct. App. 2008), for the proposition that the status of "manager" is not limited to the designation in an operating agreement, but that decision does not control this appeal.  Unlike this appeal, Budell did not involve a written operating agreement. See id. at 670 ("Notably, [the parties] never entered into a written operating agreement for [the limited liability company].").  In this appeal, the operating agreement controls the terms of management and provides that only the eight members of the board of managers manage the joint venture.  Where management power of a limited liability company "is vested in one or more managers," a

21

member who is not a manager has "no duties to the limited liability company or to the other members solely by reason of acting in his or her capacity as a member," O.C.G.A. § 14-11-305(1), and the operating agreement of the joint venture establishes that Swift is not a manager of the joint venture.

## IV. CONCLUSION

We **VACATE** the judgment in favor of Holdings and **RENDER** a judgment as a matter of law in favor of the Swift defendants.