A07A2210. STEPHENS v. McGARRITY et al.
(660 SE2d 770)

PHIPPS, Judge.

Appellant Richard Stephens and appellee Douglas McGarrity are minority shareholders of Northlake Foods, Inc. William B. Johnson, the majority shareholder of Northlake, also controls other companies, including W. B. Johnson Properties, LLC and JP Aviation, LLC. After Northlake made millions of dollars in loans to Johnson Properties and JP Aviation, McGarrity brought an action asserting both direct and derivative claims against Johnson and his entities and seeking, among other things, a return of the borrowed monies to Northlake. Stephens has brought this appeal from the trial court's approval of a settlement of McGarrity's action and from the denial of his motion to intervene in that action. Finding that the trial court abused its discretion in denying Stephens's motion to intervene and in approving the settlement, we reverse.

The evidence shows that Stephens and McGarrity each own approximately nine and a half percent of Northlake Foods, a large, privately held corporation which runs well over 100 Waffle House restaurants in the Southeast. The approximate ownership interests of the remaining shareholders are William B. Johnson, sixty percent or more; Larry Martindale, thirteen percent or more; and Daryl Saylor, one percent. In 1995, Johnson, Martindale and Stephens formed W. B. Johnson Properties, LLC. Johnson and/or Johnson Properties control a number of additional entities, including JP Aviation, W. B. Johnson Development, LLC, and W. B. Johnson Investment Company. Stephens is a shareholder of both Northlake and Johnson Properties, and served as Johnson Properties' financial officer for much of its history.

By 2005, Johnson Properties and JP Aviation had borrowed over $14 million from Northlake for activities including the operation of three private aircraft.[1] Over $6 million of this debt accrued in 2001 alone. In early 2003, Stephens and Martindale approached Johnson concerning the Johnson entities' use of the borrowed millions. After inquiries from Stephens, Johnson produced promissory notes executed by the entities, but the notes had no due date and were not

---

[1] For another derivative suit alleging shareholders' excessive spending and self-dealing involving office buildings and corporate aircraft, see *Blake v. Friendly Ice Cream Corp.*, 21 Mass. L. Rep. 131 (Mass. Super. Ct. 2006).

callable. Stephens submitted a demand letter[2] and brought an action against Johnson and the Johnson entities, asserting that the loans from Northlake were improper. In January 2006, McGarrity brought the instant direct claim, later amending his complaint to assert a derivative claim as well. Northlake was then added by consent as a defendant to the McGarrity action.

In February 2007, the parties to the McGarrity action reached a tentative settlement. Johnson himself suggested that in exchange for the cancellation of nearly $17,500,000 owed to Northlake by the Johnson entities, he and Martindale would fund the Johnson entities' payment of $2,937,000 in cash and notes to Northlake. Northlake would then pay McGarrity $2,540,000 of this amount (including $1,700,000 for McGarrity's percentage share of the debt owed to Northlake), with the remainder, $397,000, issuing as accrued bonuses to "senior management." Northlake and McGarrity would also release Johnson and his entities, including all their officers, directors, and shareholders, from any and all claims. According to the smallest minority shareholder, Saylor, Northlake never considered pursuing Johnson individually to collect the debts owed by the entities he controlled.

An apparent component of the settlement only alluded to in the agreement is Northlake's proposed sale of an Atlanta office building. This asset has a distinctive history. In December 2000, Johnson Properties transferred its interest in the building to Johnson, Stephens, and Martindale, who then assigned their interests to Northlake. In exchange for this assignment, Northlake forgave Johnson Properties debts of approximately $9,500,000. From 2001 to 2003, Johnson and Johnson Properties leased office space in the building from Northlake at a rate of $10 per month. When Stephens asked Johnson to terminate his lease and sell the building on Northlake's behalf, Johnson refused. The terms of the prospective purchase of the building are not laid out in the proposed settlement, and Northlake has not placed the building on the open market since at least 2001. The asking price is now $8 million,[3] significantly less than the $9.5 million Northlake paid (pursuant to an appraisal, and in the form of forgiving Johnson Properties' debt) seven years before. Johnson is apparently the leading candidate to buy the building at this price.

---

[2] Although the demand letter cited OCGA § 14-2-742, which provides that a shareholder may not commence a derivative proceeding without making written demand on the corporation, Stephens's complaint is not in the record, making it impossible for us to determine whether it included a derivative claim.

[3] Although the settling parties assert that the $8 million figure is "above its appraised value," they do so without citation to the record.

On February 16, 2007, the parties to the settlement filed a joint motion for approval of the settlement agreement. Pursuant to the trial court's order, notice of the proposed settlement was sent to all the shareholders, including Stephens, on February 22, 2007, allowing them until March 5 to file any objections. On March 2, Stephens filed detailed objections to the joint motion for approval; on March 14, he moved to intervene. After a hearing on March 28, the trial court approved the settlement and denied Stephens's motion to intervene as untimely, unmeritorious, and moot.

1. Before reaching the merits of the settlement agreement, as both parties apparently wish us to do, we must first determine whether the trial court erred when it denied Stephens's motion to intervene.[4]

Because the Georgia Business Corporation Code, OCGA § 14-2-101 et seq., does not provide any specific mechanism concerning the intervention of parties in derivative actions, we have applied our general intervention statute, OCGA § 9-11-24, to motions to intervene in that context.[5] Modeled on Federal Rule of Civil Procedure 24, OCGA § 9-11-24 (a) provides that "anyone" shall be permitted to intervene:

> (1) When a statute confers an unconditional right to intervene; or (2) When the applicant claims an interest relating to the property or transaction which is the subject matter of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Subsection (b) (2) specifies that "*[u]pon timely application[,] anyone may be permitted to intervene . . . [w]hen an applicant's claim or defense and the main action have a question of law or fact in common.*"[6] Finally, the statute specifies that "[i]n exercising its discretion[,] the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." We review a trial court's decision under either portion of the

---

[4] See *Burruss v. Ferdinand,* 245 Ga. App. 203 (1) (536 SE2d 555) (2000) (although an appeal from the denial of a motion to intervene usually requires an application for interlocutory appeal, a direct appeal was proper where the denial of the motion to intervene was part of a final judgment).

[5] See *Leventhal v. Post Properties,* 276 Ga. App. 742, 744 (2) (624 SE2d 223) (2005).

[6] (Emphasis supplied.)

statute for an abuse of discretion.[7]

Whether Stephens is considered an intervenor as of right or by permission, we hold that the trial court abused its discretion when it denied Stephens's motion to intervene because (a) the motion was timely and (b) his interests were not adequately represented by the existing parties.

(a) The settling parties served Stephens with notice of the proposed settlement on February 22. After Stephens timely objected on March 2 and moved to intervene on March 14, the trial court set the matter for hearing on March 28. Because Stephens timely objected to the settlement and moved to intervene shortly thereafter, two weeks before the hearing, his motion was also timely.[8]

(b) OCGA § 14-2-741 (2) provides that a shareholder may not maintain a derivative proceeding unless he "[f]airly and adequately represents the interests of the corporation in enforcing the right of the corporation." The problem here is that no court has passed upon the adequacy of McGarrity's representation except through the lens of approving the settlement of his derivative action, which leaves McGarrity with the lion's share of the compensation for the alleged misdeeds of Johnson and his entities. As the Tenth Circuit explained before it was overruled by the United States Supreme Court for barring a nonintervening class member from appealing a settlement:

> [I]n shareholder derivative suits under [Federal Rule of Civil Procedure] 23.1, a preliminary affirmative determination that the named plaintiffs will fairly and adequately represent the interests of the other class members is not a prerequisite to the maintenance of the action. Rather, the rule provides only that the derivative suit may not be maintained if it appears that the named shareholder does *not* fairly and adequately represent the other shareholders. In addition, there is no opt-out provision in shareholder derivative suits. Thus, all shareholders are bound by the outcome regardless of their objections.[9]

---

[7] OCGA § 9-11-24 (b) (2); *Allgood v. Ga. Marble Co.*, 239 Ga. 858 (239 SE2d 31) (1977) (under subsection (b)).

[8] See *Sta-Power Indus. v. Avant*, 134 Ga. App. 952, 958-959 (3) (216 SE2d 897) (1975) (plaintiffs' motion to intervene in class action after judgment was timely when discovery of class members was delayed by defendant's failure to comply with court order); compare *Greer v. Fed. Land Bank &c.*, 158 Ga. App. 60, 61-62 (279 SE2d 308) (1981) (motion to intervene was not timely when served two days before hearing on confirmation of sale of real property).

[9] *Gottlieb v. Wiles*, 11 F3d 1004, 1011 (II) (10th Cir. 1993) (citation omitted; emphasis in original), overruled on other grounds, *Devlin v. Scardelletti*, 536 U. S. 1, 6 (122 SC 2005, 153 LE2d 27) (2002); see also *Powers v. Eichen*, 229 F3d 1249, 1251-1256 (II) (9th Cir. 2000) (unnamed class member has standing to appeal award of attorney fees without intervening);

Here, it is undisputed that Stephens has been and remains a Northlake shareholder, and he has presented evidence that his investment in Northlake amounts to over $1.8 million. When Stephens moved to intervene, he raised the question whether McGarrity had fairly and adequately represented Northlake's interests when he reached the proposed settlement of Northlake's derivative action — a question which could not arise, of course, until that proposed settlement had been actually reached. Under the terms of the settlement, Johnson and his entities would obtain a release "from any and all claims . . . which arise in whole or in part from any transaction from the beginning of time through the date of this Agreement," subject only to the continuing obligations of the Northlake shareholders' agreement and the office building lease. Even assuming that Stephens would not be entitled to assume leadership of the derivative action, the settlement might well have a substantial impact on Northlake's capacity to settle Stephens's direct claims. Finally, Stephens "attended the settlement hearing and voiced before the [trial] court the same objections he now raises before us on appeal."[10]

Because Stephens was a shareholder "so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest,"[11] he was entitled to obtain an appealable determination whether McGarrity had adequately represented Northlake's interests up to and including the reaching of the settlement. The trial court thus abused its discretion when it denied Stephens's motion to intervene.[12]

2. Turning to the merits of the settlement agreement, we note that no Georgia court has previously construed or applied OCGA § 14-2-745 (§ 7.45 of the 1984 Revised Model Business Corporation Act), adopted in 1988 as part of the Georgia Business Corporation Code.[13] We begin with a review of the statute's terms and history, proceed to examine the policies animating Georgia derivative actions, and then evaluate the merits of the settlement agreement.

(a) OCGA § 14-2-745 provides:

*A derivative proceeding may not be discontinued or settled without the court's approval.* If the court determines that a

---

*Bell Atlantic Corp. v. Bolger*, 2 F3d 1304, 1310 (III) (3rd Cir. 1993) (because "[p]laintiffs' attorneys and the defendants may settle in a manner adverse to the interests of the plaintiffs by exchanging a low settlement for high fees," such an outcome "cautions against creating obstacles to challenging derivative action settlement agreements") (footnote omitted).

[10] *Bell Atlantic Corp.*, supra at 1310.

[11] OCGA § 9-11-24 (a) (2).

[12] See *Bell Atlantic Corp.*, supra at 1310 (class member has standing to challenge settlement agreement).

[13] OCGA § 14-2-101 et seq., enacted by Ga. L. 1988, p. 1070, § 1.

> proposed discontinuance or settlement will substantially affect the interests of the corporation's shareholders or a class of shareholders, the court shall direct that notice be given to the shareholders affected.[14]

Other courts have noted that this section is intended to protect nonparty shareholders when plaintiffs in a derivative action propose to settle the action those plaintiffs initiated.[15]

In this case, the result of the parties' settlement was an order of dismissal. The more general provision governing dismissals of derivative actions, OCGA § 14-2-744 (a), provides that a trial court "may dismiss a derivative proceeding" if it finds that an independent body or individual "has made a determination in good faith after conducting a reasonable investigation . . . that the maintenance of the derivative suit is not in the best interests of the corporation."

The Annotated Code's Comment explains that this dismissal statute "represents a compromise between the two principal lines of cases in this area."[16] In the first, led by New York's *Auerbach v. Bennett*,[17] courts have held that "judicial review should be limited to an analysis of the independence and good faith of the committee and the thoroughness of its investigation and that the burden of proof was on the plaintiff to show facts sufficient to require a trial on any material issue of fact."[18] The second line of cases, led by Delaware's *Zapata Corp. v. Maldonado*,[19] place the burden on the corporation "to prove the independence, good faith, and reasonable investigation of the committee"; encourage courts to examine "not only the procedures followed but also the reasonableness of the bases for the committee's conclusions"; and authorize a trial court to "apply[ ] its own business judgment[ as to] whether the motion should be granted."[20] The Comment concludes:

> The Code does not clarify what grounds, beyond a determination made in good faith, after reasonable investigation, by a disinterested body, will be considered by a court. *Consideration of whether the conclusion to dismiss was reasonably*

---

[14] (Emphasis supplied.)

[15] See *Batur v. Signature Properties of Northwest Florida*, 903 S2d 985, 993 (Fla. App. 2005).

[16] OCGA § 14-2-744 (2003 ed.), vol. 12, p. 189.

[17] 47 N.Y.2d 619 (393 NE2d 994) (1979).

[18] OCGA § 14-2-744 (2003 ed.), vol. 12, p. 189 (citation omitted).

[19] 430 A2d 779 (Del. 1981).

[20] OCGA § 14-2-744 (2003 ed.), vol. 12, p. 189 (citation omitted).

*based would represent a middle ground between deference to the investigators and total displacement of their function.*[21]

The relationship between the Code's dismissal and settlement provisions may remain unsettled in light of at least one court's holding that settlements of derivative actions present "[m]ixed questions of law and fact" requiring both deference to a trial court's findings of fact "to the extent they are supported by competent, substantial evidence" and de novo review of its conclusions of law as to the good faith of the settlement.[22] For now, however, we need only note that as the Comment to the Code suggests,[23] we review a trial court's order dismissing a shareholder's derivative action for an abuse of discretion.[24]

(b) Long before Georgia's adoption of the Model Act, our Supreme Court took a similarly realistic approach to the resolution of shareholder derivative actions in *Pickett v. Paine.*[25] In that case, the sole minority shareholder of a closely held corporation brought a direct as well as derivative action against the majority shareholder for fraud and waste of corporate assets.[26] The Supreme Court reversed the trial court's denial of summary judgment as to the minority shareholder's direct claim but affirmed the denial as to the derivative claim:

> As a general rule, a claim for misappropriation and waste of corporate assets by a director or officer of a corporation belongs to the corporation and not to its shareholders, and except in various rare circumstances, . . . *complaining shareholders will not be allowed to recover directly. . . . Any recovery, therefore, that may be had by the corporations as a result of the action may not be directly participated in by the minority shareholder.* On the other hand, any profits of the corporations that may be due and owing [the minority shareholder] can only be realized indirectly through the declaration of dividends or other corporate agreement by which such minority shareholder would be allowed a portion of the profits as perhaps related to his percentage interests in the corporations.[27]

---

[21] Id., citing *Kaplan v. Wyatt*, 499 A2d 1184 (Del. 1985) (emphasis supplied).

[22] *Batur*, supra at 995 (V) (citation and punctuation omitted).

[23] See OCGA § 14-2-744 (2003 ed.), vol. 12, p. 189.

[24] See *Thompson v. Scientific Atlanta*, 275 Ga. App. 680, 682-683 (621 SE2d 796) (2005), citing OCGA § 14-2-744.

[25] 230 Ga. 786 (199 SE2d 223) (1973).

[26] Id. at 787, 789.

[27] Id. at 790 (1) (citations omitted; emphasis supplied).

In suits alleging corporate waste by the majority shareholder of a closely held corporation, the Court concluded that the best way for the parties to establish their respective rights would be "to preserve the fiction of the corporate entity and to allow for corporate recovery through the derivative action; or, as the case may be, to allow for the realization of the equity interests of the minority shareholder . . . by way of a liquidation claim."[28] We therefore turn to the settling parties' rationale for the settlement with the view that Northlake's interests must take precedence over those of any aggrieved minority shareholder.

(c) At the hearing on the motion to approve, the trial court heard evidence from Timothy Kelly, a tax advisor and accountant who had worked with Johnson, Northlake, and its shareholders for three decades. The principal reasons offered for approval of the settlement were (i) an end to the litigation, including its risks and costs; (ii) Johnson and Martindale's contribution of $2.9 million in cash and notes, netting the company $2.5 million after allowing for the payment of management bonuses; (iii) clearance for the $8 million sale of the office building, which would also reduce expenses; and (iv) the imposition of "rigorous operating covenants" to protect the company in the future.

(i) The parties to the settlement argue that we should allow McGarrity to recover personally to the extent of his ownership in Northlake, thus removing the threat of his direct claim from the company's horizon. But minority shareholders facing the settlement of a derivative action are "entitled to more than assurances that management's negotiating prowess has led to a desirable outcome."[29] The settling parties cite abundant law for the proposition that a settlement of a derivative action requires a court to balance any further litigation's likely rewards against its risks and costs, recognizing that such litigation is "notably difficult and notoriously uncertain,"[30] and granting a presumption of fairness to the settlement as the product of arms-length negotiation.[31] When there is a substantial danger of collusion between an allegedly malfeasant majority

---

[28] Id. at 792 (1).

[29] *Batur*, supra at 995 (V) (footnote omitted); see also *In re Oracle Securities Litigation*, 829 FSupp. 1176, 1184-1187 (III) (A) (N.D. Cal. 1993) (disapproving derivative settlement which denies corporation a financial award and releases defendants from any claims the corporation might have against them; directors approving settlement had failed to act with independence and in good faith).

[30] *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D. N.Y. 1973) (footnote omitted).

[31] See *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980).

shareholder (Johnson) and a previously aggrieved derivative plaintiff (McGarrity), however, we cannot grant the settlement the benefits of such presumptions. Because McGarrity's derivative claim "belongs to the corporation and not to its shareholders,"[32] and because the law has long been suspicious of leaving the determination whether a derivative suit should be dismissed to interested insiders[33] — a group which must now be taken to include Johnson, his longtime accountant, and McGarrity as well — we cannot draw conclusions about the merits of the settlement without examining its specific benefits to Northlake.

(ii) As we have already suggested, Northlake's apparent gain of $2.9 million is actually no gain at all: $2.54 million of that amount will immediately be paid to McGarrity, with the remainder going to unspecified "senior management," perhaps including Johnson himself.

The settling parties make much of the trial court's reasoning that if the settlement is rejected on the ground that Johnson is not providing a sufficiently large cash infusion, the ensuing litigation, including arguments concerning Northlake's capacity to pierce the corporate veil still in existence between Johnson and his entities, will "destroy the corporation." Such reasoning lays the blame for Northlake's imminent destruction on precisely the wrong person. As the trial court intimated, Johnson and his entities may be responsible for up to $17 million in corporate waste — acts as to which Stephens sounded the alarm time and again, the latest occasion being his motion to intervene. If "destruction" is indeed Northlake's fate, moreover, the shareholders should share the consequences in proportion to their ownership interests, taking into account each shareholder's past contributions and extractions. In short, and in light of Stephens's own pending claim against Johnson and his entities, the defendants have not shown that the substantial diversion of "settlement" funds away from Northlake is in the corporation's best interests.[34]

---

[32] *Pickett*, supra at 790 (1).

[33] See *Auerbach*, supra at 632 ("[W]hen individual members of a board of directors prove to have personal interests which may conflict with the interests of the corporation, such interested directors must be excluded while the remaining members of the board proceed to consideration and action" concerning a derivative action.); *Zapata Corp.*, supra at 786 (even a board "tainted by the self-interest of a majority of its members[ ] can legally delegate its authority to a committee of two disinterested directors").

[34] See *In re Oracle*, supra at 1185 (III) (A) (disapproving settlement that absolved defendants of liability "without requiring them to part with any return consideration," and where settlement "ensures that the corporation may indemnify their litigation expenses") (citations omitted).

(iii) Nothing about the proposed resale of the office building suggests that it is an arms-length transaction undertaken in Northlake's best interests. The defendants have not offered an appraisal of the building and have not explained why Northlake could not raise cash by selling this asset on the open market without reference to the settlement agreement, which provides only that the parties "shall cooperate as needed to accomplish the closing for the sale of the property."[35]

(iv) Finally, the defendants' assurances that they will abide by "rigorous" operating standards in the future does nothing to remedy whatever harm Northlake has already suffered, or to compensate its shareholders for such harm.

The settlement before us succeeds only in making Northlake a conduit for funds going to McGarrity in exchange for the abandonment of the derivative action he brought — just the kind of direct recovery frowned upon by our Supreme Court.[36] We therefore conclude that the trial court abused its discretion when it approved the proposed settlement and dismissed McGarrity's action.

*Judgment reversed. Johnson, P. J., and Mikell, J., concur.*

DECIDED MARCH 19, 2008 —
RECONSIDERATION DENIED APRIL 4, 2008.

*Paul, Hastings, Janofsky & Walker, Robert M. Martin,* for appellant.
*Parker, Hudson, Rainer & Dobbs, J. Marbury Rainer, Tyler J. Voboril,* for appellees.

---

[35] See *Batur,* supra at 996-997 (where custodian failed to perform sufficient investigation of real property's market value, the trial court erred in dismissing a derivative action).

[36] See *Pickett,* supra.