**THIRD DIVISION**
**GOBEIL and**
**HODGES, JJ., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 12, 2024**

# In the Court of Appeals of Georgia

A23A1458. SONG v. EGPS SOLUTIONS I, INC., et al.

HODGES, Judge.

In this derivative and breach of fiduciary duty action, Huiming Song appeals orders by the Superior Court of Gwinnett County granting Champion Instruments, LLC's motion to dismiss Song's derivative action, and eGPS Solutions I, Inc. and Travis Pruitt's motion for summary judgment as to Song's claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and breach of contract. In five separate enumerations of error, Song contends that the trial court erred, generally, by concluding that: (1) Champion's special litigation committee was an independent body; and (2) there are no genuine issues of material fact precluding eGPS's and

Pruitt's motion for summary judgment. For the following reasons, we affirm in part and reverse in part.[1]

When viewed under the summary judgment standard,[2] the record reveals the following: Pruitt owned a majority interest and Lonnie Sears owned a minority interest in eGPS, which sells surveying equipment and supplies. In 2010, Pruitt, Sears, Song, and one other person formed Champion, a Georgia limited liability company, for the purpose of purchasing surveying instruments in China and acting as a wholesaler to eGPS and other dealers. Champion purchased equipment from China using Song's connections. In 2012, the fourth original member sold his entire interest in Champion

---

[1] We have circulated this decision among all nondisqualified judges of the Court to consider whether this case should be passed upon by all members of the Court. Fewer than the required number of judges, however, voted in favor of a hearing en banc on the question of disapproving language in *Pinnacle Benning v. Clark Realty Capital*, 314 Ga. App. 609, 612 (724 SE2d 894) (2012) and *Southwest Health & Wellness v. Work*, 282 Ga. App. 619, 623 (2) (639 SE2d 570) (2006).

[2] See *Grizzle v. Norsworthy*, 292 Ga. App. 303, 303-304 (664 SE2d 296) (2008) ("Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. In reviewing the grant or denial of a motion for summary judgment, we apply a de novo standard of review, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant."); *Thompson v. Scientific Atlanta*, 275 Ga. App. 680, 683 (621 SE2d 796) (2005) (holding that a motion to dismiss a derivative action "is perhaps best considered as a hybrid summary judgment motion for dismissal because the stockholder plaintiff's standing to maintain the suit has been lost") (citation and punctuation omitted).

2

to Song. Thus, Champion ultimately had three members: Pruitt, who owned 41.2 percent through a trust; Song, who owned 41.2 percent; and Sears, who owned 17.6 percent.

Champion's Operating Agreement required each member and manager to "act in a manner he believes in good faith to be in the best interest of [Champion] and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." The Agreement further provided that no member or manager would be liable to Champion or any other member for "any actions or course of conduct taken in good faith and reasonably believed to be in the best interests of [Champion], or for errors of judgment. . . ." Rather, members and managers "shall only be liable for willful misconduct, gross negligence, willful breach of his obligations under this Operating Agreement, or other willful or grossly negligent breach of fiduciary duty."

The members unanimously elected Pruitt to serve as Champion's sole manager who, under the Operating Agreement, had "full and complete power, authority, and discretion to take such action for and on behalf of [Champion], and in its name, as the Managers deem necessary or appropriate to carry out the purposes for which [Champion] was organized." This power was limited in the Operating Agreement by requiring "the approval of all or a portion of the Members" if the manager were to,

as is relevant to this case: "do any act in contravention of this Operating Agreement"; "do any act that would make it impossible to carry on the ordinary business of [Champion]"; or "cause the Company to sell, exchange, lease, convey or otherwise transfer all or any substantial part of the assets of [Champion], other than in the ordinary course of business."

For nearly all of Champion's existence, eGPS was its single largest customer. Since Champion had no office space, warehouses, or employees of its own, eGPS assisted in these departments to minimize Champion's overhead, including by providing accounting staff. In fact,"[w]ithout sales to and other support of eGPS, Champion would never have gotten off the ground and would not have survived."

Champion often gave discounts to customers based on their purchased volume, ranging from 25 percent to a maximum discount of 40 percent. Pruitt, as sole manager, had the discretion to set these discounts as part of the ordinary course of business . With eGPS being one of Champion's largest clients, and a high-volume purchaser, it received a 40% discount. But in 2016, Pruitt learned that Champion's competitors were offering discounts up to 50%, and he believed eGPS should be given an additional 10% discount since eGPS was Champion's highest volume client. Thus, Pruitt

authorized a discount increase from 40% to 50% to eGPS, which was made retroactive to 2010.

By 2017, eGPS had accrued a significant accounts receivable in excess of $300,000 owed to Champion. However, Pruitt unilaterally issued credit memoranda to eGPS, reducing eGPS's obligation to Champion to approximately $19,000 and increasing Champion's net annual loss from $575 to over $300,000 for the 2017 fiscal year. While this loss was borne by all three of Champion's members equally, the credit to eGPS benefitted Pruitt and Sears, as majority and minority interest holders in eGPS.

In addition to his interest in Champion, Song was the founder and general manager of manufacturer Shanghai HowayGIS Infotech Co., Ltd. ("Howay"), which was formed in 2011 and used by Champion. The record shows that in 2011 or 2012, Song began contacting Champion's dealers and offering to sell Howay products at a lower price than Champion's. In 2016, Pruitt discovered that Song was talking with Champion's dealers and promoting Howay, potentially poaching Champion's clients. Sears asked Song to stop, and Song refused. At some point in 2016, Song offered to broker a deal for the sale of part or all of Champion, and in 2017 he told at least one of Champion's dealers that Champion would be closing that year. In late 2016 and

throughout 2017, a major Champion dealer, Tri-Global Technologies, began purchasing directly from Howay after being solicited by Song.

In 2018, Champion issued a capital call in which Pruitt and Sears made contributions, but Song did not. Around this time, Pruitt offered to buy Song's interest in Champion, but Song never accepted the offer. While Champion was winding down operations and selling inventory, it continued operating and made a profit in 2018. In 2019, Song refused to contribute to another Champion capital call.

In January 2019, Song filed a derivative action against Pruitt and eGPS, but because he failed to send a written demand notice, the complaint was dismissed without prejudice in February 2019. In May 2019, Champion filed a suit in the State Court of Gwinnett County against Song alleging breach of contractual duties[3] due to Song poaching Champion's clients.[4] Thereafter, in August 2019, Song re-filed his

---

[3] Champion amended the complaint in May 2020, to include a breach of fiduciary duty claim and a request for punitive damages.

[4] Champion indicates in its appellate brief that on March 20, 2023, after the notice of appeal was filed in this case, a trial court found that Song breached his fiduciary duties and acted in bad faith, and it entered a final judgment against Song and in favor of Champion in the amount of $3,835,450.60. . It appears that Song has filed a motion for new trial in that case. See *Champion Instruments, LLC v. Huiming Song*, Gwinnett County State Court, No. 19-C-03616-S6. Citing *Griffin v. Verizon Comm.*, 746 Fed. Appx. 873, 876 (III) (11th Cir. 2018), Champion invites this Court to take judicial notice of these pleadings outside the record, as they are publicly

6

action in the Superior Court of Gwinnett County, asserting two derivative claims, a direct breach of contract claim against Pruitt, and a petition for judicial dissolution as to Champion.

In response, Champion held a meeting in October 2019 to create a Special Litigation Committee ("SLC") to investigate Song's claims. Timothy Graves and Benjamin Jordan were appointed to the committee by a two-to-one vote with Song voting by proxy against the appointment. Neither Graves nor Jordan had been employed by Champion, had business dealings with Champion, or had a relationship with Song, Pruitt, or Sears. Jordan resigned for health reasons in December 2019, and Benjamin Easterlin was appointed in January 2020 by Pruitt and Sears; although Song was given notice of the election meeting, he did not attend. Easterlin also had not been employed by Champion, had no business dealings with Champion, and had no relationship with Song, Pruitt, or Sears.

As part of its investigation, the SLC conducted multiple interviews and reviewed hundreds of pages of financial records and other documents. During Pruitt's interview, he admitted that he issued the credit memoranda to eGPS because he

available trial court pleadings. We decline Champion's invitation and have not considered these pleadings in our analysis here.

7

believed Song was stealing customers from Champion. He also admitted to "run[ning] [Champion] into the ground" to avoid distributing capital to Song.[5]

Harold Daniel, Jr., who was retained and represented Champion in the lawsuits, supported and provided assistance in the SLC investigation. Both Easterlin and Graves knew of Daniel but had no current business relationship with him, and the SLC "came to a decision without any outside influence or input." However, according to Easterlin, he "relayed the conclusions of the Special Litigation Committee to Mr. Daniel, who drafted the SLC Report at [Easterlin's] direction and with input and guidance from both [Easterlin] and Mr. Graves."[6]

The SLC issued a thorough, 18-page report on September 9, 2020, nine months after it began the investigation. The SLC determined that "Mr. Pruitt conducted himself in accordance with reasonable exercise of business judgement [sic] . . . and that he acted diligently and in good faith in overseeing and acting in what he reasonably believed to be in the best interests of [Champion] and its Members." The committee also found that "as sole Manager of the Company, [Mr. Pruitt] had the power to set prices and discounts, including the issuance of credit memorandums . .

---

[5] Of note, Champion made a profit in 2018 while winding down operations.

[6] Song argues, for the first time in his reply brief, that Daniel billed many hours regarding work for the SLC.

. to eGPS[,]" and due to the "unique relationship between Champion and eGPS . . . Mr. Pruitt did not have a conflict of interest in his actions as Manager of Champion as they related to eGPS." Based on these findings, the SLC also concluded that "eGPS did not aid and abet a breach." While the committee found that there was no breach of duty, the SLC did note that "Pruitt and Sears received indirect benefits from the issuance of the credit memorandums because they were shareholders of eGPS." As a result, the SLC recommended "reinstating accounts receivable of eGPS in the aggregate total of $305,059.38." Finally, the Committee recommended that Champion be voluntarily dissolved after the litigation matters terminated.

In September 2020, Champion moved to dismiss Song's derivative complaint based on the SLC recommendation; Song responded on February 1, 2021, allegedly the day after discovery closed. On that same day, eGPS and Pruitt moved for summary judgment on Song's derivative claims and direct breach of contract claim, to which Song responded in March 2021. Following a November 2022 hearing on both Champion's motion to dismiss and eGPS's and Pruitt's motion for summary judgment, the trial court entered two orders granting both motions. The trial court granted Champion's motion to dismiss the derivative proceedings after concluding that the SLC acted independently and that Champion did what the SLC instructed.

The trial court granted eGPS's and Pruitt's motion for summary judgment after concluding that Pruitt, as Champion's manager, did not breach any fiduciary duties owed to Song, that eGPS did not aid and abet Pruitt, and that the breach of contract claim against Pruitt directly failed as a matter of law. This appeal follows.

1. In his first enumeration, Song contends the trial court erred in finding that the SLC was independent in view of: (1) a conflict of interest created by Daniel's assistance while serving as Champion's counsel; and (2) Champion's failure to satisfy its burden to prove that an SLC member's "prior professional relationship with Champion's counsel did not influence him in favor of Champion." We find no abuse of discretion.

OCGA § 14-11-801 allows a member of a limited liability company ("LLC") to file a derivative action "in the right of the limited liability company to recover a judgment in its favor" if certain conditions are satisfied. Thereafter, a trial court

> may dismiss a derivative proceeding if, on motion by the limited liability company, the court finds that one of the groups specified in subsection (b) of this Code section has made a determination in good faith after conducting a reasonable investigation upon which its conclusions are based that the maintenance of the derivative suit is not in the best interests of the limited liability company.

OCGA § 14-11-805 (a). One such group, which is at issue here, is established by "[a] majority vote of a committee consisting of two or more independent managers or members appointed by a majority of independent managers or members present at a meeting of managers or members, as the case may be, whether or not such independent managers or members constitute a quorum[.]" OCGA § 14-11-805 (b) (2).

Of note, the LLC bears the burden "of proving the independence and good faith of the group making the determination and the reasonableness of the investigation." OCGA § 14-11-805 (a). An LLC may satisfy its burden by, inter alia, "supporting [its] motion to dismiss with a detailed and documented report, including an investigation of the members' backgrounds and qualifications, and a determination by the Board's counsel that there were no factors suggesting that any of the [SLC] members were not independent." *Benfield v. Wells*, 324 Ga. App. 85, 89 (749 SE2d 384) (2013). Importantly, "[w]e review a trial court's order dismissing a shareholder's derivative action . . . only for an abuse of discretion." Id. at 85. See also *McDonald v. Garden Svcs.*, 163 Ga. App. 851, 853 (295 SE2d 551) (1982) (holding that, absent a "manifest abuse of discretion," this Court will not substitute its judgment for the trial court's,

11

even though "individual members of this [C]ourt might reach a different conclusion").[7]

(a) *Conflict of Interest*. Song first asserts that the trial court erred in finding that the SLC was independent because the court "incorrectly placed the burden of proof upon [Song][.]" The thrust of Song's argument is that the trial court shifted the burden of proof from Champion, to establish the SLC's independence in spite of Daniel's assistance and participation as Champion's legal counsel, to Song by pointing out that there was no evidence that Daniel actually represented Champion. This is unpersuasive.

---

[7] Georgia's application of an abuse of discretion standard of review in the dismissal of derivative actions may be traced to *Kaplan v. Wyatt*, 499 A2d 1184, 1190 (II) (Del. 1985). See *Goldstein v. Wells*, 295 Ga. App. 870 (673 SE2d 325) (2009) (derivative action); *Stephens v. McGarrity*, 290 Ga. App. 755, 761 (2) (a) (660 SE2d 770) (2008) (derivative action). However, Song cites *Southwest Health & Wellness v. Work*, 282 Ga. App. 619, 623 (2) (639 SE2d 570) (2006) for the proposition that our review of such dismissals is de novo, rather than for an abuse of discretion. See also *Pinnacle Benning v. Clark Realty Capital*, 314 Ga. App. 609, 612 (724 SE2d 894) (2012) (same). A careful reading of *Pinnacle Benning* and *Southwest Health & Wellness* reveal that they relied on garden-variety breach of contract cases, instead of derivative actions, in applying a de novo standard. See *Moore v. BellSouth Mobility*, 243 Ga. App. 674, 675 (534 SE2d 133) (2000); see also *Pinnacle Benning*, 314 Ga. App. at 612 (same). In particular, it also appears that *Southwest Health & Wellness* has never been cited for that proposition throughout its 18-year history. Therefore, to the extent *Southwest Health & Wellness* and *Pinnacle Benning* may be read to suggest that a de novo standard of review is appropriate in appeals from dismissals in derivative actions, they are disapproved.

In its detailed, 18-page report, the SLC reviewed the background and qualifications of the members, which included affidavits from the members, and concluded that the SLC members were "independent in the process." For example, the members' affidavits indicated that neither had been employed by Champion or eGPS, had any interest in either entity, or knew any of the members of either entity. The trial court cited the SLC's report in its order granting Champion's motion to dismiss, and found that the SLC was independent and that "there is no evidence . . . to conclude that any prior relationship between [Daniel] as counsel for Champion, and SLC member, Timothy N. Graves . . ., resulted in an inappropriate relationship between Daniel and the SLC."

(i) *Shifting Burden of Proof.* Contrary to Song's procedural argument, there is no indication that the trial court improperly shifted the burden of proof from Champion to Song, and Song does not cite any authority supporting his argument on that point. See generally *MARTA v. Thompson*, 326 Ga. App. 631, 633 (1) (757 SE2d 228) (2014) ("There is no evidence in the record affirmatively showing that the superior court applied the wrong standard of review, and we will not presume error."). Instead, as we have held previously, a motion to dismiss a derivative action "does not technically fit into a category of OCGA § 9-11-12 (b) (6)[,] nor does it reach

13

the actual merits of the [member's] claims as would be at issue in the usual summary judgment motion pursuant to OCGA § 9-11-56[.]" *Thompson v. Scientific Atlanta*, 275 Ga. App. 680, 683 (621 SE2d 796) (2005). As a result, "it should be apparent that, upon [Champion's] coming forward with a motion to dismiss, supported by [a] voluminous and detailed report, it was incumbent upon [Song] to come forward with evidence to support his claim of lack of independence of the SLC members." Id. This is not, as Song has characterized it, an improper shifting of the burden of proof; rather, it is consistent with our general jurisprudence that a non-moving party, when confronted by a moving party with evidence, must come forward with responsive evidence to avoid the relief sought by the moving party. Compare OCGA § 9-11-56 (e) ("When a motion for summary judgment is made and supported as provided in this Code section, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Code section, must set forth specific facts showing that there is a genuine issue for trial."); see *Thompson*, 275 Ga. App. at 683 (noting that a motion to dismiss a derivative action "is perhaps best considered as a hybrid summary judgment motion for dismissal") (citation and punctuation omitted). Accordingly, we find no error with the manner in which the trial court evaluated Song's derivative action.

14

(ii) *SLC's Independence*. Turning to the substance of Song's argument, he contends that Daniel's participation undermined the SLC's independence and that the trial court's conclusion that the SLC was independent was erroneous. The only evidence that Song references in this regard is that Daniel, as he represented Champion in a separate legal action filed after Song commenced the initial derivative action, assisted the SLC in its work, a fact which the members of the SLC acknowledged. Song asserts that Daniel made the SLC aware of Champion's claims against Song to the extent that the SLC considered the claims as part of its decision to recommend dismissal of Song's derivative action. Song concludes that the SLC's awareness of Champion's claim "is fatal to any suggestion that the SLC was operating with the independence required by OCGA § 14-11-805 (a)." Song's argument is without merit.

Just as we have noted that Easterlin and Graves did not have any prior relationship with Champion before being appointed to the SLC, so, too, was Daniel a stranger to Champion. After Song commenced the initial derivative action, Champion retained Daniel, who represented Champion in its subsequent action against Song. Daniel also assisted the SLC, including drafting the SLC's report at Easterlin's direction and with "input and guidance" from both Easterlin and Graves.

15

At no time did Daniel represent the SLC, Pruitt, or any other individual associated with Champion. In addition, the members of the SLC "came to a decision without any outside influence or input."

In short, with Champion having satisfied its burden to demonstrate the SLC's independence, see *Benfield*, 324 Ga. App. at 89, the burden shifted to Song to come forward with evidence in opposition. *Thompson*, 275 Ga. App. at 683. Instead, Song offered little more than speculation that Daniel influenced the SLC, altered the outcome of the SLC's investigation, or otherwise compromised the SLC's independence. See *Kaplan v. Wyatt*, 499 A2d 1184, 1190 (II) (Del. 1985) (noting that in-house corporate counsel's assistance of corporation's SLC "not recommended," but "not fatal" to SLC's investigation). Nor does the record indicate that Daniel impermissibly represented both Champion and Pruitt in the derivative action.[8] As a result, we find no abuse of the trial court's discretion in concluding that the SLC was independent. See OCGA § 14-11-805 (a); *Benfield*, 324 Ga. App. at 88; see also *Kaplan*, 499 A2d at 1190 (II) (noting that, despite participation of in-house corporate counsel, plaintiff in derivative action "failed to present evidence showing that the

---

[8] See, e.g., *Cutshall v. Barker*, 733 NE2d 973, 980 (I) (B) (1) (Ind. App. 2000) (holding that "dual representation of a corporation and individual defendants in a derivative suit would result in a conflict of interest").

presence of the corporate officers influenced those being interviewed, altered the outcome of the investigation, or impaired the independence of the Committee in making its report"); *Cutshall v. Barker*, 733 NE2d 973, 981 (I) (B) (1) (Ind. App. 2000) (holding that law firm's simultaneous representation of corporation in derivative action and SLC of corporation did not taint SLC's independence).[9]

(b) *Prior Professional Relationship.* In a similar vein, Song also contends that the trial court erred in concluding that Graves's prior professional relationship with Daniel did not impact the SLC's independence.[10] We again disagree.

In its order granting Champion's motion to dismiss, the trial court found that "there is no evidence . . . to conclude that any prior relationship between [Daniel] as counsel for Champion, and SLC member, Timothy N. Graves . . ., resulted in an

---

[9] The only citation in support of Song's argument, *Stepak ex rel. Southern Co. v. Addison*, 20 F3d 398 (11th Cir. 1994), is inapposite. There, the Eleventh Circuit held that, if "a board's consideration of [a shareholder's] demand was dominated by a law firm that represents or previously represented an alleged wrongdoer in criminal proceedings related to the very subject matter of the demand, then the shareholder raises a reasonable doubt that the board's rejection of his demand was an informed decision protected by the business judgment rule." Id. at 407 (III) (A) (1) (a). That situation does not apply here, as Daniel represented Champion in its separate action against Song, and not the alleged individual corporate wrongdoer, Pruitt.

[10] Song again challenges the alleged shifting of the burden of proof. We have addressed that argument in Division 1 (a) (i), and we need not revisit it here.

17

inappropriate relationship between Daniel and the SLC." Evidence from the record supports the trial court's conclusion. Graves testified that he had no current relationship with Daniel, but acknowledged that he had a prior connection to Daniel resulting from Graves' unrelated derivative action against a former employer "several years ago[.]" Graves further testified that his professional acquaintance with Daniel would not affect his independence as an SLC member. Therefore, the record contains sufficient evidence to demonstrate that Daniel's limited prior professional relationship with Graves did not affect the SLC's independence.

In response, Song refers to "lighthearted" comments in the SLC's interview with Pruitt and Sears, during which Graves stated he had hired Daniel "a couple of times" and that Daniel "is not that cheap." As with Song's arguments concerning independence generally, this responsive evidence proves nothing and falls well short of the evidence necessary to challenge the SLC's independence. See *Benfield*, 324 Ga. App. at 89; *Thompson*, 275 Ga. App. at 683; see also *Conroy v. Amos*, 338 FSupp3d 1309, 1319 (I) (A) (M.D. Ga. 2018) (finding that, "notwithstanding . . . prior professional relationships between the SLC members and [CEO of company], the record establishes that the SLC members were sufficiently independent under Georgia law"); *Beam ex rel. Martha Stewart Living Omnimedia v. Stewart*, 845 A2d 1040, 1051-

1052 (Del. 2004) (holding that "[m]ere allegations that [directors] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence").

In sum, Champion supplied sufficient evidence, which Song failed to contest, demonstrating that neither Daniel nor "any [other] outside considerations influenced the conclusions reached by the [SLC;] therefore, the [SLC] must have acted independently. . . ." *Kaplan*, 499 A2d at 1190 (II). Accordingly, we find no abuse of the trial court's discretion in granting Champion's motion to dismiss Song's derivative action.

2. Next, Song argues that the SLC was not appointed by a majority of independent members because both Pruitt and Sears had a financial interest in Champion and, therefore, neither was independent. Song did not raise this argument in the trial court; therefore, we do not consider it. See generally *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 829 (2) (573 SE2d 389) (2002) ("[A]bsent special circumstances, an appellate court need not consider arguments raised for the first time on appeal.") (punctuation and footnotes omitted).[11]

---

[11] The case upon which Song relies for the proposition that he may raise new arguments on appeal concerning the sufficiency of the evidence is not binding precedent. See *Ford v. Ford*, 349 Ga. App. 45, 47 (2) (a) (825 SE2d 449) (2019)

3. In two related arguments, Song also asserts that the trial court erred in granting Pruitt summary judgment on Song's claim of breach of fiduciary duty. First, Song contends that Pruitt "was acting outside of his managerial authority in issuing the retroactive credit memoranda" to eGPS; second, Song argues that "Pruitt's actions were not based on reasonable business judgment." We do not find either argument persuasive.

In its review of Song's derivative action, the SLC determined that Pruitt "had the power to set prices and discounts" and that he "acted diligently and in good faith in overseeing and acting in what he reasonably believed to be in the best interests of the Company and its Members." The SLC added that it found no breach of fiduciary duty by Pruitt.

Thereafter, upon consideration of eGPS and Pruitt's summary judgment motion,[12] the trial court first observed that, because it had dismissed Song's derivative action based upon the SLC's recommendation, Song's substantive claim for breach of fiduciary duty was likewise dismissed.[13] Even so, the trial court concluded that Song

(physical precedent only).

[12] See *Grizzle*, 292 Ga. App. at 303-304 (outlining standard of review for summary judgment motions).

[13] The trial court did not cite any authority in support of this statement.

20

failed to show a genuine issue of material fact because, as Champion's sole manager, Pruitt had the authority to issue the credit memoranda and that the discounts reflected in the memoranda were consistent with discounts given to Champion's customers by its competitors. Finally, the trial court determined that Pruitt's actions relative to the credit memoranda and discounts were based upon reasonable business judgment.

"It is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." (Citation and punctuation omitted.) *Crawford v. Scott*, 368 Ga. App. 249, 253 (2) (889 SE2d 421) (2023). OCGA § 14-11-305 (1) provides that "[a] member or manager shall act in a manner he or she believes in good faith to be in the best interests of the limited liability company and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." As a result, managing members of a limited liability company owe fiduciary duties to the LLC and to its members. See *Internal Medicine Alliance v. Budell*, 290 Ga. App. 231, 236 (4) (659 SE2d 668) (2008). "Thus, a managing member must act with the utmost good faith and loyalty in managing the LLC." (Citation and punctuation omitted.) Id. at 237 (4). To that end, Champion's Operating Agreement required each manager and member to "act in a manner he believes in good faith to

21

be in the best interest of [Champion] and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."

(a) *Managerial Authority*. As a threshold matter, the evidence makes clear that Champion's members unanimously elected Pruitt to serve as its sole manager. Therefore, under the Operating Agreement, Pruitt had "full and complete power, authority, and discretion to take such action for and on behalf of [Champion], and in its name, as the Managers deem necessary or appropriate to carry out the purposes for which [Champion] was organized." However, Pruitt's power was not limitless, and he was required to obtain "the approval of all or a portion of the Members" if he were to, for example, "do any act in contravention of this Operating Agreement"; "do any act that would make it impossible to carry on the ordinary business of [Champion]"; or "cause the Company to sell, exchange, lease, convey or otherwise transfer all or any substantial part of the assets of [Champion], other than in the ordinary course of business."

Here, Pruitt had the power to issue, and in fact issued, the credit memoranda and discounts as a means of compensating its largest customer, in the face of stiff challenges from Champion's competitors; Song points to no evidence that Pruitt did not have such authority. Once Pruitt issued the credit memoranda and discounts,

there is no indication that the remaining members objected to Pruitt's actions. Under these facts, even when viewed in a light most favorable to Song,[14] we conclude that Pruitt "did not breach any managerial fiduciary duty by merely taking action expressly authorized by the operating agreement." *Colquitt v. Buckhead Surgical Assocs.*, 351 Ga. App. 525, 529 (2) (a) (831 SE2d 181) (2019); see also *Ledford v. Smith*, 274 Ga. App. 714, 725 (2) (a) (618 SE2d 627) (2005) (finding no breach of fiduciary duty where terms of operating agreement "allowed the business activity which occurred").

(b) *Reasonable Business Judgment.* Nor is Song's argument concerning Pruitt's exercise of reasonable business judgment well-taken. Under Georgia law, the business judgment rule

> generally precludes claims against officers and directors for their business decisions that sound in ordinary negligence, except to the extent that those decisions are shown to have been made without deliberation, without the requisite diligence to ascertain and assess the facts and circumstances upon which the decisions are based, or in bad faith.

---

[14] Again, Song offers only extremely limited facts in support of his argument.

*FDIC v. Loudermilk*, 295 Ga. 579, 585 (1) (761 SE2d 332) (2014). Here, upon consideration of the evidence in the light most favorable to Song, we adopt the trial court's cogent analysis in granting Pruitt's summary judgment motion:

> Champion depended on eGPS to survive, as eGPS accounted for most of Champion's sales through the years. With that volume in mind, Champion offered eGPS a significant discount, at the high end of what Pruitt believed was common in the industry. Further, Champion's competitors offered higher discounts to their high-volume customers, leading Pruitt to believe a higher discount for eGPS — Champion's key customer — was reasonable. Pruitt further considered eGPS's prior work to keep Champion afloat. Since Champion's formation, eGPS had provided employees, office space, warehouses, communications services, research and development services, and labor to Champion, largely without compensation. Indeed, eGPS "bore the brunt of all the Champion expenses." And without eGPS's sales and support, "Champion would never have gotten off the ground and would not have survived." Pruitt also believed that maintaining eGPS's business served to offset the damage of Song's efforts to siphon of[f] Champion customers for himself.

(Footnotes omitted.) We conclude that Pruitt acted with reasonable business judgment and that the trial court correctly granted his motion for summary judgment

24

on this issue. See *Grizzle*, 292 Ga. App. 303-304 (reciting summary judgment standard of review).

4. Song next contends the trial court erroneously granted eGPS's motion for summary judgment on Song's claim of aiding and abetting Pruitt's breach of fiduciary duty. Song adds no additional analysis and simply states that, since "his breach of fiduciary duty claim should have survived, his aiding and abetting claims likewise should not have been rejected."

For the reasons stated in Division 3, the trial court correctly granted Pruitt's summary judgment motion as to breach of fiduciary duty. Turning to Song's claim for aiding and abetting a breach of fiduciary duty, Song must establish four elements:

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

(Citation and punctuation omitted.) *TMX Finance v. Goldsmith*, 352 Ga. App. 190, 213 (9) (833 SE2d 317) (2019). First, of course, there must be a breach: "The breaches have to have occurred; otherwise, [eGPS] cannot be held liable for aiding and abetting." *Ledford v. Peeples*, 657 F3d 1222, 1260 (IV) (A) (11th Cir. 2011); see also *Globis Partners v. Plumtree Software*, 2007 Del. Ch. LEXIS 169, \*55 (II) (D), 2007 WL 4292024, \*15 (II) (D) (Del. Ch. 2007) (dismissing claim for aiding and abetting breach of fiduciary duty due to failure to state a claim for underlying breach of fiduciary duty). Since there is no breach of fiduciary duty, as outlined in Division 3, there is no claim for aiding and abetting a breach of fiduciary duty. Accordingly, we affirm the trial court's order on this issue.

5. Finally, Song argues that the trial court erred in granting Pruitt's summary judgment motion as to Song's claim for breach of contract. In particular, Song asserts that there are genuine issues of material fact concerning whether Pruitt breached the Operating Agreement by: (a) "issuing the credit memoranda without first obtaining the approval of a majority in interest of Champion's Members[;]" and (b) failing to act "in a manner he believes in good faith to be in the best interest of [Champion] and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." In part, we agree.

26

(a) *Contractual Duty to Obtain Prior Approval.* "The elements for a breach of contract claim in Georgia are (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 371 (1) (669 SE2d 179) (2008).

Here, it is undisputed that Pruitt did not issue advance notice to Champion's members or obtain approval of a majority of Champion's members prior to implementing the credit memoranda, but it is disputed whether this was required under the Operating Agreement. At the outset, the Operating Agreement granted Pruitt broad powers as Champion's duly-elected sole manager. However, Pruitt was required to obtain "the approval of all or a portion of the Members" if he were to, for example, "do any act that would make it impossible to carry on the ordinary business of [Champion]"; "cause [Champion] to sell, exchange, lease, convey or otherwise transfer all or any substantial part of the assets of [Champion], other than in the ordinary course of business"; or "cause the dissolution of [Champion]." In his responses in opposition to Champion's motion to dismiss the derivative proceeding and to eGPS's and Pruitt's motion for summary judgment, Song alleged that the multi-year, retroactive nature of the unilateral credit issued by Pruitt "imposed a serious, negative impact on Champion's financial condition." In support, Song

pointed to an affidavit from an accountant retained by the SLC, which showed that Champion reported a net loss of $305,634.54 for 2017. Absent the application of the credit, Champion's net loss would have been approximately $575 in 2017.

Accordingly, Pruitt's issuance of the multi-year, retroactive credit memoranda arguably had a material impact on Champion's business operations, which might have been sufficient to trigger the requirement under the terms of the Operating Agreement that he obtain prior approval from the other members.[15] Moreover, there is nothing in the record before us to suggest that the other members were *required* to object or that their failure to do so absolved Pruitt of any wrongdoing under the terms of the Operating Agreement. As a result, we conclude that genuine issues of material fact remain as to whether Pruitt's issuance of the credit memoranda implicated the contractual duty to obtain approval from the members and, if so, whether Song waived the right to object to Pruitt's actions despite the Operating Agreement's provision that "[n]o term or condition of this Operating Agreement shall be considered waived by a Member, unless such waiver is in writing and is signed by such Member." See,

---

[15] The trial court did not expressly discuss the multi-year, retroactive nature of the credit in its order granting summary judgment against Song's claims. Rather, the court focused on Pruitt's explanation that it was in Champion's interest to issue the credit in order to stay in line with competitors that offered comparable discounts to its significant customers and eGPS was Champion's biggest client.

e.g., *Greenberg Farrow Architecture v. JMLS 1422, LLC*, 339 Ga. App. 325, 332 (2) (791 SE2d 635) (2016) ("[T]he existence of a waiver generally is a jury question. If there is conflicting evidence over whether a waiver occurred, the issue is for a jury to resolve. In particular, a party's protracted silence, or unreasonable delay in making protest, can raise a fact issue as to whether [he] has waived a contractual right.") (citations and punctuation omitted). Therefore, we reverse that portion of the trial court's order granting eGPS's and Pruitt's motion for summary judgment as to Song's breach of contract claim based upon the contractual duty to obtain approval for certain actions.

(b) *Contractual Fiduciary Duty of Good Faith*. In contrast, however, Song's only argument in support of his breach of contract claim as it relates to Pruitt's exercise of the contractual fiduciary duty of good faith is, essentially, a warmed-over version of his breach of fiduciary duty claim addressed in Division 3. Because Song failed to overcome the evidence we have reviewed demonstrating the validity of Pruitt's actions, even when construing the evidence in a light most favorable to Song, we conclude that the trial court did not err in granting Pruitt's motion for summary judgment on Song's claim of breach of contract related to the contractual fiduciary duty of good faith. See generally OCGA § 9-11-56 (e).

29

In sum, we affirm the trial court's order granting Champion's motion to dismiss the derivative action. We affirm in part and reverse in part the trial court's order granting eGPS's and Pruitt's motion for summary judgment.

*Judgment affirmed in part and reversed in part. Senior Judge C. Andrew Fuller concurs. Gobeil, J., concurs fully to Divisions 1, 2, and 5(a), concurs specially to Divisions 3 and 4, and dissents to Division 5(b).*

A23A1458. SONG v. EGPS SOLUTIONS I, INC. et al.

GOBEIL, Judge, concurring in part and dissenting in part.

For the reasons that follow, I concur fully to Divisions 1, 2, and 5 (a); concur specially to Divisions 3 and 4; and respectfully dissent to Division 5 (b).

1. I respectfully dissent to Division 5 (b), affirming the trial court's grant of Travis Pruitt's summary judgment motion as to Huiming Song's direct claim for breach of contract as it relates to Pruitt's exercise of the contractual fiduciary duty of good faith. Based on the limited record before us at this stage, I am not convinced that we can say that no genuine issues of material fact remain as to whether Pruitt's

decision to issue the multi-year, retroactive credit to eGPS Solutions I, Inc., and the resulting significant impact on Champion's financial operations, breached his fiduciary duty to Champion. See *Quinn v. Cardiovascular Physicians, P. C.*, 254 Ga. 216, 219 (5) (326 SE2d 460) (1985) (noting that in the context of a professional corporation "[i]t is well-settled that corporate actions which effect radical change — such as transfer of all assets, or liquidation — must be taken with scrupulous loyalty to the interests of minority shareholders"). This is especially true given, as the Majority acknowledges, there is no dispute that the issuance of the credit memoranda benefitted Pruitt, who was a majority interest holder in eGPS. See id. ("A fiduciary's duty of good faith prohibits him from appropriating for himself the assets and property of the corporation, to the exclusion of minority shareholders.").

2. With respect to Divisions 3 and 4 of the Majority, I concur to the extent that I agree that Song's derivative claims for breach of fiduciary duty against Pruitt and aiding and abetting the breach of a fiduciary duty against eGPS were extinguished by the trial court's dismissal of Song's derivative action.